**Donald R. MINTZ, Plaintiff,**

**v.**

**Sidney BARTHELEMY; William J. Guste Jr.; and the Supervisory Committee on Campaign Finance Disclosure.**

**Civ. A. No. 89–3884.**

United States District Court,
E.D. Louisiana.

Oct. 3, 1989.

Phillip A. Wittman, Richard C. Stanley, George C. Freeman III, New Orleans, La., for plaintiff.

Morton Katz and Julian R. Murray Jr., New Orleans, La., for defendant Barthelemy.

Dale Wilks, Asst. Atty. Gen., New Orleans, La., for defendant Guste.

John Kennedy, Sp. Counsel to the Governor, and R. Gray Sexton, Baton Rouge, La., for defendant Supervisory Committee.

## OPINION

PATRICK E. CARR, District Judge.

This civil action is before the Court on affidavits and signed stipulations of fact, submitted in lieu of trial. Having considered the record, the evidence, the arguments of counsel, and the applicable law, the Court now rules as follows. To the extent any of the following findings of fact constitute conclusions of law, the Court adopts them as such; to the extent any of the following conclusions of law constitute findings of fact, the Court adopts them as such.

Donald Mintz and incumbent Sidney Barthelemy have both announced their intent to run in the upcoming February 1990 primary mayoral election for the City of New Orleans. Prior to 1989, Barthelemy accumulated a sizable campaign fund, including numerous contributions over $5,000 and a great many more not itemized in state disclosure reports; Mintz did not.

In July 1988, the Louisiana Legislature enacted statutory provisions that generally prohibit candidates for, among other offices, the office of Mayor of New Orleans from receiving contributions over $5,000 from any single person or from not itemizing for state reporting requirements all contributions received. These provisions became effective January 1, 1989.

Asserting that the new statute violates his constitutional rights of equal protection under the Fourteenth Amendment by invidiously discriminating against challengers to incumbents and against latecomers to elections, Mintz asks this Court either to enjoin Barthelemy from spending any contributions that, while legal when received, would be illegal if received now or to declare the contribution limitation unconstitutional as applied against him. Alternatively, asserting that the new statute violates his constitutional rights of freedom of speech under the First and Fourteenth Amendments by effectively limiting the amounts he may spend in effort to become elected, Mintz asks this Court again to declare the contribution limitation unconstitutional as applied against him. Along with this relief, he also seeks attorney's fees under 42 U.S.C. § 1988. Additionally, asserting pendent jurisdiction, Mintz asserts similar claims under Louisiana state law.

The Court is unable to conclude that Mintz has presented sufficient evidence to distinguish the Louisiana statute from the

federal campaign contribution-limitation laws upheld against similar constitutional attacks in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thus, the Court dismisses Mintz' federal claims on the merits. Doctrines of federalism, comity, and abstention persuade this Court that it should decline to exercise what discretion it may have to decide the pendent state law claims. Thus, the Court dismisses Mintz' state law claims without prejudice to his right to pursue them in state court.

## I.

In 1975, the Louisiana Legislature enacted its first campaign finance disclosure laws, known as the Campaign Finance Disclosure Act ("CFDA"). *See* La.Acts 1975, No. 718, § 1 (codified at La.R.S. 18:1481–18:1493 (West 1979)).[1] Among other things, these laws established requirements that the total amount of all contributions received by a candidate for an election to public office, *see* La.R.S. 18:1486(C)(1) (redesignated and amended in 1976 as § 18:1486(E)(1)), and the name of each person who made single or aggregate contributions exceeding certain defined dollar amounts, *compare id.* § 18:1486(C)(2) (redesignated and amended in 1976 as § 18:1486(E)(2)) *with id.* § 18:1482(11) (redesignated in 1976 as § 18:1482(13)), be disclosed to the appropriate designated "reporting official," *compare id.* § 18:1486(A) *with id.* § 18:1483(A) *and* § 18:1482(12); for mayoral candidates for the City of New Orleans, the disclosure reporting amount was $500, *compare id.* § 18:1482(9) *with id.* § 18:1482(13)(b). Further, these laws established requirements that each candidate keep records of the name of every

contributor and the dollar amount of every contribution received, *see id.* § 18:1485(A), and that no candidate be generally permitted to expend contributions from an anonymous source, *see id.* § 18:1488(F) (redesignated and amended in 1976 as § 18:1488(E)).[2] Further, these laws provided criminal penalties for their violation, *see id.* §§ 18:1489(B), 18:1491, 18:1492(D). These laws did not, however, impose limits on the amount of contributions any candidate could receive.

The following year, the Legislature amended the CFDA to require that disclosure be to the "Supervisory Committee, Election Campaign Finance Disclosure Act." *See* La.Acts 1976, No. 386, § 1 (amending La.R.S. 18:1486(A), 18:1492(B)(1)).

In 1980, the Legislature substantially revised and enlarged these laws. *See* La. Acts 1980, No. 786, § 1 (codified at La.R.S. 18:1481–18:1511.11). Unlike the 1975 version, the 1980 version of the CFDA codified a "Statement of Purpose":

> The legislature recognizes that the effectiveness of represenative [sic] government is dependent upon a knowledgeable electorate and the confidence of the electorate in their elected public officials. The legislature, therefore, enacts this Chapter [La.R.S. 18:1481–1511.11] to provide public disclosure of the financing of election campaigns and to regulate certain campaign practices.

La.R.S. 18:1482. The 1980 version kept the same general requirements mentioned above for the earlier version and likewise imposed no limits on the amount of contributions any candidate could receive;[3] the

---

**1.** Minor amendments to these laws were made by La.Acts 1976, No. 386, § 1 and by La.Acts 1978, No. 137, § 1.

**2.** This last provision contained two limited exceptions not at issue here: no records, beyond aggregate records, needed be kept for the sale of campaign paraphernalia in single transactions of $25 or less or for the sale of tickets to testimonials or similar fund raising events in single transactions of $100 or less. *See* La.R.S. 18:1488(F) (redesignated and amended in 1976 as § 1488(E)).

**3.** Among other things, the 1980 version of the CFDA kept the requirements for disclosure of the total amounts of all contributions received by a candidate for an election to public office, *see* La.R.S. 18:1495.5(B)(2)–(3), and of the name of each person who made single or aggregate contributions exceeding certain defined dollar amounts, *compare id.* § 18:1495.5(B)(5) *with id.* § 18:1483(17); and the requirements that each candidate keep records of the name of every contributor and the dollar amount of every contribution received, *see id.* § 18:1495.3(B)(1), and that no candidate be permitted to expend contributions from an anonymous source (with the

1980 version did, however, raise to $2,000 the disclosure reporting amount for, among others, New Orleans mayoral candidates, *compare* La.R.S. 18:1483(11) *with id.* § 18:1483(17)(a), and elaborated on provisions for civil and criminal penalties, *see id.* §§ 18:1505.3–18:1505.6.

Thereafter, minor amendments were made to the 1980 version of the CFDA. *See* La.Acts 1981, No. 59; La.Acts 1982, Nos. 266, 652; La.Acts 1984, Nos. 466, 492; La.Acts 1985, No. 550; La.Acts 1986, No. 669; and La.Acts 1987, Nos. 722, 757, 831. Included among these changes were one lowering to $1,000 the disclosure reporting amount for, among others, New Orleans mayoral candidates, *see* La.Acts 1982, No. 266, § 1 (amending La.R.S. 18:1483(17)), and one changing the name of the supervisory committee to the Supervisory Committee on Campaign Finance Disclosure and designating that the members of the [Louisiana] Board of Ethics for Elected Officials constitute the new supervisory committee, *see* La.Acts 1981, No. 59, § 1 (amending La.R.S. 18:1483(20), 18:1511.1).

In 1988, broad changes were made to the CFDA. *See* La.Acts 1988, No. 994. Among two of its significant changes were a requirement that the name of every contributor and the amount of every contribution irrespective of amount be fully disclosed, *see id.* § 1 (amending La.R.S. 18:1495.5(B)(5)), and a provision limiting contributions to established dollar amounts, *see id.* (adding La.R.S. 18:1505.2(H)).[4] For New Orleans mayoral candidates, this limitation is, with limited exceptions not raised here, $5,000 per contributor. *See* La.R.S. 18:1505.2(H)(1)(a)(i). Section 5 of the 1988 Act provides the following:

The provisions of Sections 1, 3, and 4 of this Act shall become effective on January 1, 1989; all other provisions of this Act shall become effective upon signature of the governor or lapse of time for gubernatorial action.

As the changes mentioned above were made by § 1 of the 1988 Act, these changes "bec[a]me effective on January 1, 1989."

On November 30, 1988, the State Ethics Board issued a "minute entry," which reads in pertinent part as follows:

The Board, in its capacity as the Supervisory Committee on Campaign Finance Disclosure, considered a staff report in Docket No. 88–103 concerning the retroactive application of reporting requirements under recent amendments to the Campaign Finance Disclosure Act. In connection with the retroactivity of the aggregating period, on motion made and passed, the Board concluded that the application of Act 994 will become effective January 1, 1989 and only those transactions which occur after that date will be required to be reported and those previous transactions will be reported under the provisions of the "old law". In connection with contribution limits, the Board concluded that contribution limits will go into effect January 1, 1989 and any contributions received prior to January 1, 1989 do not count toward the limits which will go into effect January 1, 1989.

The Board's issuance of this statement presumably rests on its rule-making and advisory-opinion-issuing authority under La.R.S. 18:1511.2.[5]

### II.

Plaintiff in this action is Donald R. Mintz, a New Orleans resident. On March 10, 1989, he commissioned the first polls to determine the feasibility of his running for

---

**4.** The 1988 amendments kept the remaining earlier provisions discussed above, except that the 1988 amendments also removed ticket sales from the exception to the prohibition against anonymous contributions, *see* La.R.S. 18:1495.-3(B)(4).

same two limited exceptions concerning campaign paraphernalia at or under $25 and fund raising events at or under $100), *see id.* § 18:1505.2(B).

**5.** While plaintiff questions the binding or persuasive nature of this "minute entry," he does not appear to question its existence or the Court's ability to acknowledge its existence. *Cf. Matter of Waller Creek, Ltd.,* 867 F.2d 228, 238 n. 14 (5th Cir.1989) (discussing F.R.Ev. 201(b)(2)).

mayor of the City of New Orleans in the February 1990 primary election. On June 21, 1989, the Friends of Donald Mintz was formed and properly recorded. The next day, Mintz held a press conference at which he expressed his intent "to explore further the possibilities of running for mayor." On September 14, 1989, he announced his candidacy. By law, *compare* La.R.S. 18:467(4) *with id.* § 18:468, he must formally qualify between December 13 and 15, 1989.[6]

Defendants in this action are Sidney Barthelemy, who is the present Mayor of New Orleans, the sole other person formally to announce his candidacy for the election, and who is being sued in his personal capacity only; William J. Guste Jr., the Attorney General of the State of Louisiana, who is being sued in his official capacity only; and the Supervisory Committee on Campaign Finance Disclosure.

Mintz states that he "intend[s] to convey [his] ideas to the public through the media of television, radio and printed materials to inform the public of [his] positions and to permit voters to make a fair and educated choice among the candidates for the office of mayor." As his campaign disclosure report confirms, Mintz suggests that he has incurred and will incur substantial expenses in the mayoral race in order "[t]o mount an effective campaign and to express [his] views to the electorate." Thus, like any candidate in a mayoral election for a large American city, Mintz "must seek financial support in the form of contributions from citizens." Mintz further suggests the modern-day truism that "[w]ithout substantial financial support from such people ... [he] shall be ... disadvantaged in communicating [his] political views to the electorate." He concludes that "[b]ecause contributions from political supporters constitute the dominant source of campaign financing, the contribution limits specified in [La.R.S. 18:]1505.2 impose a *de facto* limit on the amount of funds a candidate will have available to spend in presenting his views to the public."

Prior to January 1, 1989, Mintz and his representatives neither received nor solicited campaign contributions. From January 1, 1989 to July 28, 1989, Mintz collected $170,225 in contributions; of this amount, $125,000 came from 25 contributions of $5,000 each.

Campaign finance disclosure reports filed by Barthelemy for a total period from April 1, 1986 to July 5, 1989 reveal the following information:

| | |
|---|---:|
| Itemized contributions from 4/01/86 to 12/31/86: | $0 |
| Nonitemized contributions from 4/01/86 to 12/31/86: | 58,911 |
| 77 Itemized contributions during 1987 | 196,875 |
| Nonitemized contributions during 1987 | 42,821 |
| 260 Itemized contributions during 1988 | 621,200 |
| Nonitemized contributions during 1988 | 266,392 |
| Contributions from 1/01/89 to 7/05/89 | 0 |
| TOTAL= | $1,186,199 |

In each instance where a person's contributions were itemized in a particular year's report, his total amount of contributions for that year equalled or exceeded $1,000. The present record does not reveal whether

---

**6.** Mintz provided the specifics of these statistics by an affidavit he moved to file on September 22, 1989. Defendant Supervisory Committee objected to the filing of the affidavit as being filed after "[t]he deadline for filing stipulations in this matter" and as containing unspecified "statements to which this defendant is unwilling to stipulate." Except perhaps for the date on which and the fact that Mintz commissioned certain polls, the statistics offered by Mintz are ones of which a court in the New Orleans area may properly take judicial notice, with or without direct evidence. *See generally* F.R.Ev. 201(b)(1)–(2). Thus, and because the facts in the affidavit do not adversely affect defendants in the judgment in this action, *cf. Figgs v. Quick Fill Corp.,* 766 F.2d 901, 903 (5th Cir.1985); *In re Multiponics, Inc.,* 453 F.2d 853, 855 (5th Cir. 1972), the Court granted Mintz' motion to file his affidavit and accepts the facts therein as true.

in accordance with La.R.S. 18:1495.3(B)(1), Barthelemy has kept personal itemized records for those contributions not itemized on the disclosure reports (i.e., whether Barthelemy has records that, for *each* nonitemized contribution, reveal the name of the contributor and the amount of the contribution or whether any of these nonitemized contributions were in fact anonymous). The parties have broken down the contributions to Barthelemy; their analysis reveals the following:

| | | |
|---|---|---|
| 337 itemized contributions | | $818,075 |
| sum of [the total itemized amount given by each contributor up to $5,000] | 609,425 | |
| sum of [the total itemized amount given by each contributor exceeding $5,000] | 208,650 [7] | |
| Total nonitemized contributions | | $368,124 |
| TOTAL= | | $1,186,199 |

At Mintz' count, there were at least 48 instances where Barthelemy received total contributions over $5,000; at defendants' count, there are no more than 46 such instances.[8]

Barthelemy's latest report, filed August 4, 1989, shows that he has accumulated net contributions as of July 5, 1989 in the amount of $833,169. Objecting to this large amount, Mintz avers:

If Barthelemy is permitted to use his Contribution Fund without limit to finance his mayoral campaign, while his challengers are required to comply with the contribution limits set forth in [La. R.S. 18:]1505.2, the election process will be unfairly and unjustifiably structured to favor Barthelemy, thereby denying the public the right to select a mayor in an evenhanded and impartial election.

Countering Mintz' position, defendants seek to introduce a statement that reads as follows:

According to campaign finance disclosure reports filed by Buddy Roemer in his 1987 campaign for governor, [Roemer] did not accept campaign contributions of over $5,000 from one person, the limit now applicable to candidates for mayor of New Orleans. As of 180 days prior to the 1987 election, Roemer had received $379,319.39 in contributions. Reports filed by Governor Edwin W. Edwards in connection with this same election indicate his receipts of numerous contributions and loans of over $5,000.

Although Mintz does not appear to contest the accuracy of this statement, he objects to its admissibility on grounds of relevancy.

7. Barthelemy's 1988 disclosure report contains what appears to be an error: it shows a single, $5,000 contribution by Vic Trapani on December 15, 1988, yet lists his total contributions for 1988 as being $7,000. Accepting plaintiff's position, the Court uses the $7,000 amount for the $208,650 figure.

Also included in this $208,650 figure is another $23,500 in dispute between the parties. In seven instances, joint contributions (e.g., by a husband and wife or by an individual and his business) were made where the total contributions exceeded $5,000; plaintiff argues that any amounts over $5,000 should be computed in the "excess" category, while defendants argue that only amounts over $10,000 should be so computed. While noting that plaintiff's position appears weak, *but cf.* La.R.S. 18:1505.2(A) (prohibiting contributions and loans through the name of a third-party), the Court nonetheless accepts plaintiff's position.

8. The discrepancy between 46 and 48 arises due to the parties' dispute discussed in footnote 7 above (specifically, the parties dispute whether to include the $5,000-or-$7,000 contribution by Vic Trapani and the two contributions totalling $5,500 by D. Halpern and K. Daigle among the total number of "excess" contributions). Mintz also notes that until Barthelemy reveals an individualized breakdown of the contributions not itemized in his disclosure reports, it is impossible for Mintz or the Court to determine the 48-or-46 figure is in truth larger—and thus the qualifier "at least."

### III.

Because Mintz' complaint states colorable claims for relief under the constitution and laws of the United States, the Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Because Mintz' claims arose in this district, venue is proper pursuant to 28 U.S.C. § 1391(b).

Mintz raises three broad constitutional claims. The Court summarizes them as follows: (1) the 1988 amendment setting general per-person campaign contribution limitations and the 1988 amendment no longer permitting nonitemized contributions ("the 1988 Amendments"), if both construed not to apply to campaign contributions received prior to January 1, 1989, violate the Fourteenth Amendment equal protection rights of Mintz and fellow challengers to incumbents in elections for public office in Louisiana; (2) these two 1988 Amendments, if so construed, violate the Fourteenth Amendment equal protection rights of Mintz and fellow "latecomers" to upcoming elections for public office in Louisiana; and (3) the 1988 Amendments violate the First and Fourteenth Amendment speech rights of Mintz and fellow candidates running for public office in Louisiana. Below, the Court addresses these three federal claims in turn.[9]

### A.

Mintz' equal protection claim as a challenger to an incumbent turns on the construction of the 1988 Amendments to the CFDA as a matter of state law. He argues that the amendments as applied in his case violate his Fourteenth Amendment rights of equal protection if the amendments are construed not to apply to campaign contributions received by a candidate prior to January 1, 1989. Thus, he asks the Court to construe the statute contrariwise as a

matter of state law and to declare that the 1988 Amendments apply (prospectively) to contributions received at any time, whether before or after January 1, 1989. In this connection, he specifically asks the Court to prohibit Barthelemy from hereinafter spending any sums derived from contributions exceeding $5,000 (viz., $208,650) or any sums derived from nonitemized contributions (viz., another $368,124).[10] Alternatively, if the Court does not construe the amendment as he suggests as a matter of state law, then he asks the Court to declare the amendments unconstitutional, at least as applied to him in this particular election.

■ Generally, canons of federal statutory construction dictate that a federal court should attempt to construe a federal statute in such a manner to avoid any federal constitutional issues. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, ——, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). Mintz argues by analogy that this Court should apply the same rule in construing a state statute against a federal constitutional challenge: hence, the basis for his request that this Court construe the 1988 Amendments as a matter of state law. Whatever the merits of Mintz' analogy, a related court-created doctrine compels federal courts to observe the comity concerns in Our Federalism: if construction of a state statute as a matter of state law would avoid a federal constitutional claim and the construction of the statute is not already well-established, then the federal court should generally abstain from addressing the federal constitutional issue until after a state court has definitively construed the statute. *See Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941);

---

9. Because the Court disposes of this case on other grounds, the Court does not address whether Barthelemy should be deemed a "state actor" or is otherwise a proper party defendant, whether attorney's fees under 42 U.S.C. § 1988 may be awarded against either Guste or the Supervisory Committee, or whether Mintz' construction of the 1988 Amendments would create a valid constitutional claim on Barthelemy's behalf for the State's "taking" without due process

of law his previously legally acquired property (viz., the "excess" contributions).

10. Ostensibly, Mintz would have no objection to Barthelemy's spending this latter $368,124 amount if Barthelemy discloses the names of the contributors to the sum and the amount of each individual contribution comprising this sum.

*see also Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

Of course, in abstaining, a federal court does not guarantee an aggrieved plaintiff that the state courts, to which he is directed, will construe the state law in his favor; thus, whenever a federal court abstains for these reasons, the possibility always remains that the federal court will at some subsequent time be asked to address the same federal constitutional issues.

■ Noting the distinct possibility that abstention would merely delay the ultimate resolution of the parties' dispute and noting further that the dispute contains an urgent temporal concern defined by the upcoming February election, the Court chooses not to abstain on this claim inasmuch as the federal law appears well-established against Mintz' position even if the 1988 Amendments are construed in the manner he considers infirm. In other words, the Court need not construe the amendments as a matter of state law, for the Court determines that the result is the same—Mintz' position fails as a matter of federal constitutional law—no matter how the amendments are construed as a matter of state law. *Cf. Texas Employers' Insurance Ass'n v. Jackson*, 862 F.2d 491, 497 n. 8 (5th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1932, 104 L.Ed.2d 404 (1989). With this preface, the Court turns to the merits of Mintz' first claim.

■ In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court gave its seminal opinion on the constitutionality of various federal election campaign laws. Addressing First Amendment concerns of free speech and free association, the Court struck down laws that limit the amount of money a person may *expend* on his own behalf in connection with an election, but upheld laws that limit the amount of money a person may *contribute* to an election *candidate* and that require *disclosure* of a contributor's name.[11]

The plaintiffs, who included or supported challengers to incumbent congressmen, also asserted "that the contribution limitations work such an invidious discrimination between incumbents and challengers that the statutory provisions must be declared unconstitutional on their face." *Id.* at 30–31, 96 S.Ct. at 640. Noting there was no evidence in the record to support such a factual claim, the Court refused to find the statute invalid on its face. Mintz's equal protection argument between incumbents and challengers appears to be no more than the argument that the Court rejected in *Buckley.* As with the federal statute there, the state statute here does not distinguish on its face between incumbents and challengers. Nor has Mintz identified any "material resources … the Government makes available to … incumbents." *Id.* at 33 n. 38, 96 S.Ct. at 641 n. 38.

The fact that Barthelemy amassed a considerable amount of potential campaign funds prior to the effective date of the new statute does not mean that the 1988 Amendments favor incumbents. First, there is nothing to suggest that Mintz or anyone else was prohibited from amassing "excess" or "nonitemized" or "anonymous" amounts prior to January 1, 1989. Second, Mintz presents no evidence that Barthelemy's ability to have amassed such money arose solely or principally because of his position as incumbent mayor. Third, Mintz does not suggest or show any evidence that the Louisiana Legislature intended to favor Barthelemy or any other incumbent when it passed the 1988 Amendments to the CFDA.

---

**11.** The sole basis for limiting contributions to candidates is "the prevention of quid pro quo corruption between a contributor and a candidate." *Citizens Against Rent Control v. City of Berkeley, California*, 454 U.S. 290, 297, 102 S.Ct. 434, 438, 70 L.Ed.2d 492 (1981); *see also Federal Election Commission v. National Conservative Political Action Committee*, 470 U.S. 480, 496–97, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985). Thus, the Supreme Court has also invalidated a statute completely forbidding corporations "from making contributions or expenditures advocating views on ballot measures," *Berkeley,* 454 U.S. at 297–98, 102 S.Ct. at 438 (discussing *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)), and an ordinance limiting contributions to committees advocating views on ballot measures, *id. passim.*

Thus, the Court must reject this first claim.

## B.

In his reply memorandum, Mintz argues his equal protection claim on an alternative basis as well, that the 1988 Amendments invidiously discriminate against "late-comers" to elections, that is, against persons who did not decide to seek office and specifically to campaign until on or after January 1, 1989. As support for this alternative position, he points to *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

In *Dunn,* the plaintiff challenged a state statute that required a person to be a state resident for at least one year in order to be eligible to vote. Finding that the state impermissibly burdened a person's "fundamental personal rights" to vote and travel, the Court upheld the challenge and struck the statute as being unconstitutional. While the Court mentioned in passing that plaintiff styled his claim as an "equal protection" claim, *see id.* at 335, 92 S.Ct. at 999, the analysis of both the majority and the dissent focused on due process/fundamental rights principles and never suggested that persons who registered late to vote were a "suspect class," similar to racial minorities or resident aliens; heightened judicial scrutiny was required, the majority held, because the statute unduly interfered with a "fundamental," or substantive constitutional, right.

If *Dunn* is to apply by analogy, it may only be to the extent that the 1988 Amendments unduly burden Mintz' free speech rights.[12] The Court must conclude then that this alternative equal protection claim is but a disguised version of his third claim,

discussed below in Part II(C).[13] Thus, the Court turns to this third claim for resolution of this second claim as well.

## C.

■ Mintz' final constitutional argument is that the 1988 Amendments as applied to him impermissibly burden his First and Fourteenth Amendment[14] rights to be permitted to spend as much money as he wants in order to express his political views and to run for public office.

Mintz asks this Court to address this claim only in the event that the Court does not construe the 1988 Amendments as he suggests. From this position, one could infer that Mintz is suggesting that his First Amendment claim arises only if the 1988 Amendments are construed against his suggestion. Yet his arguments in support of this last claim do not turn on the issue of whether the 1988 Amendments apply to contributions received prior to January 1, 1989; this injunctive claim seeks prospective relief concerning funds to be raised in the future and thus does not depend on the dates when any earlier contributions were made. Thus, noting that *Pullman* abstention does not apply, the Court pretermits a decision whether the Court should accept the inference.

Turning to the merits of this claim, the Court finds that it fares no better than the others. Following *Buckley,* a state may generally limit contributions to a candidate and may require contributors to disclose their identity, but may not limit amounts the candidate may expend. To distinguish this general rule under *Buckley,* Mintz argues that the contribution limit amounts to "a *de facto* limit" on his right to expend as much money as he wants.[15] As support for

---

**12.** Mintz does not suggest that his claim would succeed under the lesser scrutiny of a rational-relationship test and does not ask the Court to scrutinize the 1988 Amendments under this lesser standard.

**13.** To the extent that Mintz would argue further, this Court would be compelled to abstain under *Pullman* and progeny.

**14.** "The First Amendment is made applicable to the states by virtue of the due process clause of

the Fourteenth Amendment." *Finkelstein v. Barthelemy,* 678 F.Supp. 1255, 1256 (E.D.La. 1988) (Schwartz, J.) (citing *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925)).

**15.** Mintz offers no arguments of why the 1988 Amendment prohibiting nonitemized contributions, no matter how construed vis-à-vis pre–1989 contributions, impermissibly infringes on his speech rights.

his argument, he simply states another modern-day political truism that campaign contributions constitute the "dominant source" of a candidate's campaign expenditures. This argument, however, raises no points not already at issue, and rejected (at least implicitly) by the majority, in *Buckley;* the argument is merely a restatement of the dissenting position of Chief Justice Burger, who argued: "Limiting contributions, as a practical matter, will limit expenditures and will put an effective ceiling on the amount of political activity and debate that the Government will permit to take place." *Id.* 424 U.S. at 242, 96 S.Ct. at 737 (Burger, C.J., dissenting in part).

Thus, the Court must reject both the second and third claim.

### D.

■ Finally, Mintz raises state law claims under the Louisiana constitution and under the CFDA. Pointing to *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), he suggests that the Court has pendent jurisdiction to address these claims.

The Court quotes Judge Schwartz' recent explanation on pendent state law claims:

A federal court has broad constitutional power under Article III to hear pendent state law claims along with federal claims when both the federal and state claims arise from a common nucleus of operative facts. But if the federal claim is too insubstantial to be the basis for federal subject matter jurisdiction, there can be no pendent jurisdiction over the state law claims.

When a federal court has the power to assert pendent jurisdiction, it asserts that jurisdiction under "a doctrine of discretion, not of plaintiff's right." In determining whether to exercise its discretion, this Court is to consider "judicial economy, convenience and fairness to litigants" and should avoid "[n]eedless decisions of state law." If before trial the Court dismisses the federal claims on a motion to dismiss or for summary judgment, even if "not insubstantial in a jurisdictional sense," the Court should ordinarily dismiss the state law claims as well. Relevant, though perhaps not determinative, to the exercise of this discretion is whether the state law claims would be barred in state court by the applicable statute of limitations. Not being on the merits, any such dismissal of these state law claims is without prejudice.

*Finkelstein v. Barthelemy,* 678 F.Supp. 1255, 1261–62 (E.D.La.1988).[16]

The Court does not determine whether Mintz' federal constitutional claims are insubstantial in a jurisdictional sense; even assuming they are not (so that the Court has the Article III power to address Mintz' pendent state law claims), the Court would exercise its discretion not to address those claims. First, the parties' dispute on how to construe the 1988 Amendments as a matter of state law is not as clear-cut as either side would argue. *Cf. id.* at 1266–67 & n. 79. Second, the state law claims are not soon to prescribe under the applicable statutes of limitation. Third, by accepting Mintz' version of all disputed facts without holding an evidentiary hearing, the Court avoided a final trial. *See Wong v. Stripling,* 881 F.2d 200, 202 (5th Cir.1989); *cf. Evans v. City of Dallas, Texas,* 861 F.2d 846, 853 (5th Cir.1988) (per curiam) (affirming pretrial dismissal of pendent state law claims, where the district court heard trial on the plaintiff's constitutional claim). Fourth, and perhaps foremost, to address the state law claims would vitiate the comity concerns of *Pullman* and its progeny.

Thus, the Court does not address the merits of Mintz' state law claims and leaves him to pursue those claims in state

---

**16.** The Fifth Circuit's recent opinion in *McKee v. City of Rockwall, Texas,* 877 F.2d 409, 416 (5th Cir.1989), could be construed as mandating a dismissal of pendent state-law claims whenever federal constitutional claims are dismissed prior to trial, at least on immunity grounds. *See id.* at 426 (Goldberg, J., dissenting). The Court need not determine whether the majority in *McKee* intended to announce a new standard, for as explained below, the result in this instance is the same whether or not Judge Goldberg's approach is followed.

court if he desires. *See Hamill v. Wright*, 870 F.2d 1032, 1038 (5th Cir.1989).

## IV.

For these reasons, the Court dismisses plaintiff's federal constitutional claims with prejudice, dismisses his state constitutional and statutory claims without prejudice to his right to pursue them in state court, and directs that plaintiff bear all costs. Judgment shall enter forthwith.