**NATIONAL BLACK POLICE ASSOCIATION, et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, Defendants.**

No. 94–1476.

United States District Court, D. Columbia, Civil Division.

July 29, 1994.

Arthur Spitzer, Washington, DC, for plaintiffs.

William Lewis, Washington, DC, for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This case is now before the Court on plaintiffs' motion for a preliminary injunction. On July 13, 1994, the Court denied plaintiffs' motion for a temporary restraining order. Having considered the arguments and authorities presented in the briefs filed by the

parties, the intervenor and the *amici*,[1] the supplementary filings, and the oral arguments presenting at the July 21, 1994 hearing, the Court denies plaintiffs' motion for the reasons that follow.

## BACKGROUND

In this action, a number of plaintiffs challenge the constitutionality of a District of Columbia law ("Initiative 41") on the ground that it imposes unprecedented limitations on the rights of individuals and groups to contribute, and of political candidates to accept contributions, in support of campaigns for elected public office. The registered voters of the District of Columbia voted to enact Initiative 41 on November 3, 1992. Initiative 41 became effective as D.C.Law 9–204 on March 17, 1993. The law limits contributions to $100 per election cycle for candidates for city-wide office, including Mayor, City Council Chair, and at-large council members. It limits contributions for ward offices to $50. In addition, the law aggregates contributions made during the primary and general elections and provides that a person may not contribute more than $600 to all candidates.[2]

Plaintiffs in this action include citizens, and associations of citizens, who wish to participate in the political process by making publicly-disclosed contributions to political candidates they favor; candidates who need to receive such contributions; and citizens and associations of citizens who wish to receive information.

Defendant District of Columbia Board of Elections and Ethics is an independent agency of the District of Columbia. Pursuant to D.C.Code § 1–1431, it is responsible for the implementation and enforcement of Initiative 41, and is authorized to maintain and defend, in its own name, any civil action relating to

the enforcement of the provisions of Initiative 41.

## DISCUSSION

### A. *STANDARD*

■ The granting of injunctive relief rests with the discretion of the court. *Foundation on Economic Trends, et al. v. Heckler*, 756 F.2d 143, 151 (D.C.Cir.1985). Applying the standards for preliminary injunctive relief, as set forth in *Virginia Petroleum Jobbers Assoc. v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958), and *WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977), a court should consider whether plaintiffs have demonstrated (1) that they are likely to succeed on the merits, (2) that they will suffer irreparable injury if an injunction is not issued, (3) that the defendants will not suffer substantial harm if the injunction is issued, and (4) that the public interest favors the granting of immediate relief.

### B. *SUCCESS ON THE MERITS*

Plaintiffs argue that the contribution limitations imposed by Initiative 41 violate the rights of freedom of speech and freedom of association as guaranteed by the First Amendment and the equal protection of the laws as guaranteed by the Fifth Amendment of the Constitution of the United States.

Opponents argue that plaintiffs' challenges are foreclosed by the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and its progeny. Opponents also argue that equitable considerations, including the doctrine of laches, bar plaintiffs' action.

---

1. For the reasons stated at the hearing held on July 21, 1994 the Court granted the District of Columbia's motion to intervene permissively, pursuant to Fed.R.Civ.P. 24(b). The Court denied the motions to intervene filed by Common Cause and Common Cause/District of Columbia and Association of Community Organizations for Reform Now, Inc. ("ACORN") but allowed these entities to participate as *amici*. For simplicity, the Court addresses the arguments of defendants, intervenor and amicus parties collectively in this

Memorandum Opinion, and the Court refers to these groups as "opponents."

2. Initiative 41 did not repeal a prior District of Columbia law, D.C.Code § 1–1441, which limited contributions to $2,000 for Mayor; $1,000 to At–Large Members of the School Board; $200 to Ward School Board Members and political party officials. The aggregate contribution permitted for all candidates under the prior law was $4,000.

### 1. Plaintiffs' First Amendment Claims

■ Plaintiffs present three main arguments to support their claim that the campaign contribution limitations imposed by Initiative 41 violate the First Amendment. First, plaintiffs argue that the limitations are not narrowly tailored to advance the government's interests of preventing government corruption or the appearance thereof. Second, plaintiffs argue that Initiative 41 will impair certain individual voters' abilities to receive information from political candidates because the candidates will not be able to raise money to issue mailings and circulate information to the voters. Third, plaintiffs Libertarian Party and the District of Columbia Chapter of the Republican National African-American Council ("DC–RNAC") argue that Initiative 41 abridges the First Amendment rights of political parties to decide for themselves what contribution limits, if any, should apply to intra-party campaigns for party nominations.

The Supreme Court's decision in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), provides the starting point for plaintiffs' First Amendment challenges. In *Buckley,* candidates for federal office, political parties and organizations brought an action challenging the constitutionality of various provisions of the Federal Election Campaign Act of 1971 ("the Act"). Most relevant to the instant action was a provision limiting individual political contributions to any single candidate to $1,000 per election.[3] The *Buckley* appellants claimed the $1,000 contribution limitation was unconstitutional because it unjustifiably burdened their First Amendment freedoms, was overbroad, and discriminated against challengers and minor-party candidates, in violation of the Fifth Amendment.

Rejecting the *Buckley* appellants' First Amendment challenge to the Act's contribution limitations, the Supreme Court drew a clear distinction between contribution and expenditure limitations. While the Court recognized that both types of limits implicated fundamental First Amendment interests,[4] the Court found that the Act's expenditure ceilings imposed significantly more severe restrictions on the protected First Amendment freedoms of political expression and association than did its limitations on financial contributions. 424 U.S. at 20–21, 96 S.Ct. at 635–36. Nonetheless, the Court acknowledged that "contribution restrictions *could* have a severe impact on political dialogue *if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy.*" *Id.* at 21, 96 S.Ct. at 635 (emphasis added). Considering the evidence before the Court, however, the Court found no indication that the $1,000 contribution limitation would have a dramatic adverse effect on the funding of campaigns and political associations.

Applying "the rigorous standard of review established by [its] prior decisions,"[5] the Court held that "the weighty interests served by restricting the size of financial contributions to political candidates [were] sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling." 424 U.S. at 29, 96 S.Ct. at 640. Although the defenders of the $1,000 ceiling argued that *three* separate gov-

---

**3.** Additional provisions challenged in *Buckley,* but not as relevant here, included various provisions which imposed an overall annual limitation of $25,000 by any contributor, limited independent expenditures by individuals and groups "relative to a clearly identified candidate" to $1,000 a year, and imposed prescribed limits on campaign spending by candidates and spending for national conventions by political parties.

The *Buckley* appellants also challenged the reporting and disclosure provisions of the Federal Election Campaign Act, the Federal Election Commission, and the system of public funding of Presidential campaign activities established by Subtitle H of the Internal Revenue Code.

**4.** Specifically, the Court stated that such restrictions operate to reduce the quantity and diversity of political expression, 424 U.S. at 19–20, 96 S.Ct. at 634–35, and impinge on protected associational freedoms, *id.* at 22–23, 96 S.Ct. at 636–37.

**5.** Citing earlier decisions of the Court, the Supreme Court stated, "[e]ven a 'significant interference with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs a means closely drawn to avoid unnecessary abridgment of associational freedoms." 424 U.S. at 25, 96 S.Ct. at 638 (citations omitted).

ernmental interests,[6] justified the Act's restrictions on large campaign contributions, the Court found it "unnecessary to look beyond the Act's primary purpose—to limit the actuality and appearance of corruption resulting from large individual financial contributions—in order to find a constitutionally sufficient justification for the $1,000 contribution limitation." *Id.* at 26, 96 S.Ct. at 638. The Court determined that the Act's contribution limitations had only a limited effect on First Amendment freedoms because they left "persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Id.* at 28, 96 S.Ct. at 639. The Court specifically noted that the Act's contribution ceilings did not foreclose special interest groups' substantial contributions to candidates through the combined effect of individual contributions and that the Act did not limit the number of funds that could be formed through the use of subsidiaries, corporations, or of local and regional units of a national labor union. *Id.* n. 31.

Opponents in this action contend that *Buckley* precludes plaintiffs' First Amendment claims. Like the contribution limitations in *Buckley*, opponents claim the limitations imposed by Initiative 41 do not prevent candidates from disseminating their political messages. Opponents maintain that despite the $50 and $100 limits, candidates can still raise sufficient funds, or get their messages out through less costly means, such as increasing the use of volunteers, appearing at public meetings, or participating in group forums among candidates.

Plaintiffs argue that the instant case is distinguishable from *Buckley* because unlike the Federal Election Campaign Act's contribution limitations provisions, Initiative 41's contribution limitations provisions are not narrowly tailored to serve a legitimate compelling governmental interest. Relying on the *Buckley* Court's statement that "contribution restrictions could have a severe impact on political dialogue if the limitations prevent candidates and political committees from amassing the resources necessary for effective advocacy," *id.* at 21, 96 S.Ct. at 635, plaintiffs assert that the $50 and $100 contribution limitations at issue in the instant case are so low that they prevent challengers, independent and minor party candidates from mounting *effective* campaigns for public office.[7] In other words, the limits are so low that some candidates are unable to "amass[ ] the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21, 96 S.Ct. at 636. Plaintiffs note that the limitations imposed by Initiative 41 are 1/20th and 1/10th the size of the $1000 limitations upheld in *Buckley*, or less than 4% and 2%, taking inflation into account. Additionally, plaintiffs contend the $50/$100 limits have a much greater impact on political dialogue in the District of Columbia election races because the vast majority of political campaign contributions in the District of Columbia exceed $50 and $100, whereas in *Buckley* the $1000 limit affected only 5.1% of all contributions.[8]

Plaintiffs have attached several declarations to support their assertions. For instance, the declarations of current challengers, including James Caviness, John T. Har-

---

**6.** In addition to arguing that the contribution limits served to prevent corruption and the appearance of corruption, the defenders also argued (1) that the limits muted the voices of affluent persons and groups in the election process and thereby equalized the relative ability of all citizens to affect the election process, and (2) acted as a brake on the skyrocketing cost of political campaigns and therefore opened the political system more widely to candidates without access to sources of large amount of money. 424 U.S. at 25–26, 96 S.Ct. at 637–638.

**7.** To support their argument, plaintiffs cite *FEC v. National Conservative Political Action Committee ("NCPAC")*, 470 U.S. 480, 105 S.Ct. 1459, 84

L.Ed.2d 455 (1985), a case in which Justices White, Brennan and Marshall, all of whom voted to uphold the contribution limits in *Buckley* stated, "[t]he situation might be different if the regulation significantly favored incumbents; for example, if Congress had imposed unreasonably low spending limits that placed a particular burden on challengers." *Id.* at 509 n. 6, 105 S.Ct. at 1475 n. 6.

**8.** The statistical findings agreed to by the parties in *Buckley* indicated that the 1,161 candidates for Congress in 1974 obtained approximately 5.1% of the $73,483,613 they raised from contributions in excess of $1,000. 424 U.S. at 21 n. 23, 96 S.Ct. at 636 n. 23.

vey, III, Ron L. Magnus, and Vincent Orange,[9] indicate that they need to receive large contributions to run successful campaigns. Other declarations reveal that individuals are willing to give such challengers contributions above the $50/$100 limits. Moreover, plaintiffs' expert contends that Initiative 41's low contribution limits will operate as a *de facto* limit on expenditures. *See* Curtis Gans Declaration.

Plaintiffs further argue that Initiative 41 violates the First Amendment because it is not narrowly tailored to serve a legitimate compelling governmental interest. Plaintiffs contend that the new contribution limits do no more to limit corruption than did the District's prior limits which restricted contributions to $2,000 for Mayor, $1,000 to At-Large Members of the School Board, $200 to Ward School Board Members and political party officials; the aggregate contribution permitted for all candidates under the prior law was $4,000. Moreover, plaintiffs contend that the other alleged purposes opponents advance to justify Initiative 41's contribution limitations (such as equalizing the relative ability of citizens, regardless of wealth, to affect the election process; bringing down the high costs of campaigns; changing the nature of campaigns away from advertisements, television commercials and mailings toward candidate forums, debates, and direct voter-candidate contact) are illegitimate. Quoting the Supreme Court's opinion in *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley,* plaintiffs maintain that the *only* justifiable compelling state interest behind Initiative 41 can be to prevent corruption. *See Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley,* 454 U.S. 290, 297, 102 S.Ct. 434,

437, 70 L.Ed.2d 492 (1981) (*"Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to First Amendment. The exception relates to the perception of undue influence of large contributors to a candidate. . . .").

It is undisputed that the contribution limitations imposed by Initiative 41 are considerably more restrictive than the $1000 limitation the Supreme Court upheld in *Buckley.* In light of the fact that at least 27 states have recently enacted campaign reform measures that contain provisions similar to the $50 and $100 contribution limitations imposed by Initiative 41, the Court is surprised that more recent and analogous cases do not exist. At the July 21 hearing, the Court specifically inquired whether the parties were aware of any similar challenges being raised or considered by other courts. At the time, counsel was unaware of any such cases.[10]

Subsequently, on July 26, 1994, plaintiff's counsel filed a notice of additional authority with the Court. Included in this filing was a copy of Judge Paul A. Magnuson's relatively recent, unpublished decision in the consolidated cases of *Day v. Hayes,* C.A. No. 3–93–857 (May 27, 1994), and *Minnesota Citizens Concerned for Life, Inc. v. Hayes,* C.A. No. 3–93–876 (May 27, 1994), currently on appeal from the United States District Court for the Third District of Minnesota to the United States Court of Appeals for the Eighth Circuit, *sub nom. Day v. Holahan,* Docket No. 94–2387. On the following day, the Court received another notice of additional authority from amici DC ACORN. Attached to this filing was an opinion by Chief Judge Diana E. Murphy of the United States District

9. Plaintiff James Caviness is a declared candidate for the Republican nomination for the office of Mayor; plaintiff John T. Harvey is a declared candidate for the D.C. Statehood Party nomination for At-Large Member of the D.C. Council; plaintiff Ron L. Magnus is a declared candidate for the Democratic Party nomination for Ward Five Member of the D.C. Council; plaintiff Vincent Orange is a declared candidate for the Democratic Party nomination for Ward Five Member of the D.C. Council.

10. Plaintiffs' counsel indicated, as did Judge Magnuson in his recent opinion, *infra,* that several post-*Buckley* cases have upheld limits on contributions. However, none of the limits at issue in those cases fell below $1000. *See, e.g., California Med. Ass'n v. FEC,* 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (upholding $5000 annual limit on contributions to political committees); *Mintz v. Barthelemy,* 722 F.Supp. 273, 281–82 (E.D.La.1989), *aff'd,* 891 F.2d 520 (5th Cir.1989) (upholding $5000 contribution limit for local mayoral election); *Mott v. FEC,* 494 F.Supp. 131 (D.D.C.1980) (upholding $5000 contribution).

Court for the Fourth District of Minnesota ruling on a motion for preliminary injunction in another case challenging the same contribution limitations, *Minnesotans for Term Limits v. Hayes,* C.A. No. 3–93–766, and *Christopher Longley v. Hayes,* C.A. No. 4–93–805.

At first glance, the Minnesota cases appear directly on point with the instant case. However, a closer analysis reveals that the $100 statutory contribution limitation provision at issue in the Minnesota cases is notably distinct from the $50 and $100 contribution limitations imposed by Initiative 41.

In *Day v. Hayes* and *Minnesota Citizens Concerned for Life, Inc. v. Hayes,* plaintiffs (various of political funds, taxpayers, interest groups and their contributors, candidates) sought a declaratory judgment that certain provisions of Minn.Stat. § 10A (Supp.1993) violated the First and Fourteenth Amendments and a permanent injunction enjoining the defendants from enforcing the statute. Among the statutory provisions plaintiffs challenged was Minn.Stat. § 10A.27 subd. 12., a provision limiting individual contributions to political funds and committees to $100 per year.[11] Plaintiffs Minnesota Citizens Concerned for Life Committee for State Pro–Life Candidates ("MCCLCSPC") and its member/officers contended that the $100 contribution limit impermissibly infringed upon their right of free association guaranteed by the First Amendment and violated the Fourteenth Amendment guarantee of equal protection of the laws.

Initially, Judge Magnuson denied plaintiffs' motions for preliminary injunctions. At that time, he concluded that the relatively low limit on monetary contributions did not offend the rights of association implicit in the First Amendment. Slip Op. at 24.[12] At the summary judgment stage, however, Judge Magnuson reached a different conclusion. Upon further review of the record, economic data and relevant case law, he determined that the $100 annual limit was too low to pass constitutional muster. *Id.* Specifically, he concluded that "the $100 limit [wa]s so low that it unnecessarily limit[ed] the rights of citizens to engage in legitimate expressive political activity and abridge[d] their rights of association guaranteed by the First Amendment." *Id.* at 27. Because he held the provision invalid under the First Amendment, Judge Magnuson did not assess the plaintiffs' equal protection claim.

Similarly, in *Minnesotans for Term Limits v. Hayes* and *Christopher Longley v. Hayes,* plaintiffs, Minnesotans for Term Limits and Republican Victory Club, brought actions alleging that the same statutory provision violated the First and Fourteenth Amendments and Article 1, Section 3 of the Minnesota Constitution. Like Judge Magnuson, Chief Judge Murphy denied the motion for preliminary injunction of plaintiff Republican Victory Club. However, she granted the motion with respect to plaintiffs Minnesotans for Term Limits. She noted that unlike plaintiff Republican Victory Club, a political committee that makes campaign contributions directly to candidates, plaintiffs Minnesotans for Term Limits do not contribute directly to candidates and serve different purposes under differing time constraints for their activities.

For two main reasons, this Court does not believe either of these cases substantially strengthens plaintiffs' or defendants' position in the instant case. First, and most significantly, the $100 per year contribution limitation imposed by Minn.Stat. § 10A.27 subd. 12. differs from the $50 and $100 contribution limitations imposed by Initiative 41 in that it limits contributions from any entity to a po-

---

11. Minn.Stat. § 10A.27 subd. 12. provides:

The treasurer of a political committee or political fund, other than a candidate's principal campaign committee or a political party unit as defined in section 10A.275, shall not permit the political committee or political fund to accept aggregate contributions from an individual, political committee, or political fund in an amount more than $100 a year.

12. Judge Magnuson denied the preliminary injunction with respect to all of the claims because at the time it was not clear that the plaintiffs had alleged sufficient interests and facts to confer standing and to make the case ripe for the court's review. Slip Op. at 5. Subsequently, plaintiffs remedied the arguable deficiencies by adding facts sufficient to show that the candidates they oppose would likely be eligible for public subsidy in the upcoming election. *Id.*

litical committee or political fund.[13] The plaintiffs in the Minnesota cases did not challenge a provision of the Minnesota statute which is more analogous to the contributions limits at issue here, one which limited contributions in some elections to public office to $100.[14] Second, with the exception of plaintiffs Minnesotans for Term Limits' motion for preliminary injunction, both of the Minnesota district courts rejected plaintiffs' First Amendment claims at the preliminary injunction stage. Although Judge Magnuson eventually granted summary judgment in plaintiffs' favor, holding that the $100 limit offended the rights of association implicit in the First Amendment, he did so only after further development of the record.

Recognizing that the $1000 contribution limitation the Supreme Court upheld in *Buckley* was substantially greater than the $50 and $100 contribution limitations at issue in this case, the Court believes plaintiffs may succeed on the merits of their First Amendment claims. However, the Court is hesitant to draw a bright line and make a determination that a $50 or $100 contribution limitation is constitutionally infirm, particularly at the preliminary injunction stage. While the *Buckley* Court acknowledged that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy," *id.* 424 U.S. at 21, 96

S.Ct. at 636, it also implicitly cautioned courts against legislating appropriate dollar amounts.[15] Quoting the United States Court of Appeals for the District of Columbia Circuit's decision below, the Supreme Court stated:

'[i]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as a $1,000.' Such distinctions in degree become significant only when they can be said to amount to differences in kind.

424 U.S. at 30, 96 S.Ct. at 640 (quoting *Buckley v. Valeo*, 519 F.2d 821, 842 (D.C.Cir. 1975)). The key issue for this Court is whether the $50 and $100 contribution limitations represent "differences in kind."

Absent a more developed factual record, the Court cannot find that plaintiffs have carried their burden of showing a likelihood of success on the merits. Given the competing evidence before the Court, it is extremely difficult, if not impossible, at this juncture of the case, for the Court to determine whether Initiative 41's contribution limitations are so low they in effect infringe on plaintiffs' campaign expenditures. To rebut plaintiffs' claims, opponents have produced declarations from other minor party and independent candidates who maintain that Initiative 41's limitations on contributions help their campaigns relative to the incumbents.[16] These declar-

---

13. Additionally, the $100 limitations imposed by the Minnesota statute operate on an annual, as opposed to an election basis. The Ninth Circuit emphasized the distinction between annual and election based contribution limitations in *Service Employees International Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, *cert. denied,* — U.S. —, —, 112 S.Ct. 3056, 3057, 120 L.Ed.2d 922 (1992), see discussion *infra.*

14. Minn.Stat. § 10A.27 subd. 1 limits contributions by individuals, political committees or funds to $2,000 in an election year for governor and lieutenant governor running together, and $500 in other years; to $1,000 in an election year for attorney general and $200 in other years; to $500 in an election year for the office of secretary of state, state treasurer or state auditor and $100 in other years; to $500 in an election year for state senator or representative and $100 in other year(s).

15. The Court also notes that in *Buckley*, the Supreme Court stated that two major party senato-

rial candidates, Ramsey Clark and Senator Charles Mathias, Jr., operated large scale campaigns on contributions raised under a voluntarily imposed $100 contribution.

16. Among the applicants for intervention are Robin Stallings and Ken Fealing who are currently running for office in Ward One. Stallings contends in his declaration that he has raised a significant amount of money and feels he benefits from the new limits imposed by Initiative 41. Likewise, Fealing asserts in his declaration that he strongly believes that the campaign contribution limits established by Initiative 41 benefit him in that they have helped lessen the gap in fundraising that would have existed between my campaign and the incumbent's if Initiative 41 had not been enacted. In addition, the D.C. Statehood Party supports Initiative 41 because its candidates are often at a financial disadvantage over incumbent candidates and candidates of major parties who raise money in relatively large amounts from businesses, special interest

ants also dispute plaintiffs' claims that the contribution limitations are so low minor and independent party candidates cannot mount effective campaigns.

Similarly, the Court cannot discern, based on the evidence before it, whether the new contribution limits do no more to limit corruption than did the District's prior limits. Nor can the Court determine at this point whether Initiative 41 is sufficiently narrow to further the additional compelling interests advanced by opponents to support the constitutionality of Initiative 41.[17] Despite the arguably contrary language in *Berkeley*, the Court declines to read *Buckley* as narrowly as plaintiffs suggest and interpret *Buckley* as restricting legitimate compelling governmental interests solely to limiting corruption and the appearance of corruption. The supporters of the contribution limitations in *Buckley* argued that the limits served to mute the voices of the affluent and acted as a brake on the costs of elections, as well as limiting corruption or the appearance thereof. The Supreme Court did not reject the alternative bases for the contribution limitations. Rather, the Court found it "unnecessary to look beyond the Act's primary purpose" which was limiting corruption to sustain the contribution limitations. *Buckley*, 424 U.S. at 26,

96 S.Ct. at 638; *see FEC v. NCPAC*, 470 U.S. at 496–97, 105 S.Ct. at 1468 ("preventing corruption or the appearance of corruption are the only legitimate compelling government interests *thus far identified* for restricting campaign finances") (emphasis added).[18]

■ It is likewise difficult for the Court to assess plaintiffs' other First Amendment claims. In addition to arguing that Initiative 41 is not narrowly tailored to further a compelling government interest, plaintiffs also contend Initiative 41 unconstitutionally impairs certain individual voters' ability to receive information from candidates and abridges the First Amendment rights of political parties (such as the Libertarian Party and DC–RNAC) to decide for themselves what contribution limits, if any, should apply to intra-party campaigns for party nominations.[19] Thus, the Court refrains from deciding these issues at this time.

### 2. Plaintiffs' Equal Protection Claims

■ Plaintiffs allege that the $50/$100 contribution limitations imposed by Initiative 41 invariably and invidiously advantage the incumbents. Additionally, plaintiffs claim that the incumbents' abilities to spend pre-Initiative 41 funds violate the equal protection

---

groups and wealthy individuals. Other defendant-intervenors express similar views in their declarations. *See, e.g.*, Declarations of John Capozzi, Sam Jordan and Kathryn A. Pearson-West.

17. In addition to combatting corruption or the appearance of corruption, as noted earlier in this Memorandum Opinion, opponents argue that the contribution limitations imposed by Initiative 41 further additional compelling governmental interests, such as: changing the nature of campaigns by forcing candidates to emphasize issues over advertising, creating better-educated voters, equalizing the impact that citizens regardless of wealth can have on the electoral process, and increasing participation in the electoral process.

18. *See also Day v. Hayes, Minnesota Citizens Concerned for Life, Inc. v. Hayes*, slip op. at 2. n. 1 (determining Minnesota legislature's intent behind statute was to reduce the potential and appearance of corruption in political process after reviewing statute's legislative history). According to ACORN, Judge Magnuson's conclusion is flawed because he improperly relied on the statements of individual legislators to determine the legislature's intent. ACORN contends

that the preamble of the ballot for Initiative 41 accurately describes the intent of the citizens to address corruption in passing Initiative 41, not the statements of individuals or organizations.

19. Plaintiffs point out that one of the major effects of Initiative 41 is to divert political contributions away from the candidates and into the hands of independent organizations (PAC's). Plaintiffs present evidence from the 1993 special election campaign for the Chairman of the D.C. Council and contend this was the first election in which PAC's were a major force.

Given the Supreme Court's ruling in *Buckley*, the Court does not believe this effect provides a legitimate basis for enjoining the Board of Elections from enforcing Initiative 41. In *Buckley*, the Supreme Court upheld a $1000 contribution limitation because it still left contributors "free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." 424 U.S. at 22, 96 S.Ct. at 636. The Court stated, "the Act's contribution limitations permit[ted] associations and candidates to aggregate large sums of money to promote effective advocacy." *Id.*

rights of challengers, minority party or independent candidates, and candidates who do not have substantial personal wealth, family-owned newspapers, or similar advantages.

In *Buckley,* the Supreme Court rejected the appellants' equal protection claim and upheld the contribution limitations at issue because "the Act appl[ied] the same limitations on contributions to all candidates regardless of their present occupations, ideological views, or party affiliations." 424 U.S. at 31, 96 S.Ct. at 641. The Court found no evidence to support the claim that the contribution limitations discriminated against challengers as a class. *Id.* at 31–32, 96 S.Ct. at 640–41. Although the Court found the charge of discrimination against minor-party and independent candidates "more troubling" than that against major-party candidates, it found no basis in the record to conclude that the Act invidiously discriminated against either candidate. *Id.* at 33, 96 S.Ct. at 641. The Court stated that the fact that "the limitations may have a significant effect on *particular* challengers or incumbents," did not justify invalidating the legislation. *Id.* The Act was evenhanded in that it treated all candidates equally with regard to contribution limitations. In addition, the Court speculated that, for a variety of reasons, the restriction would benefit minor-party and independent candidates relative to their major party opponents. *Id.* at 33–34, 96 S.Ct. at 641–642.

To support their equal protection claim, plaintiffs rely heavily on *Service Employees*

*International Union v. Fair Political Practices Comm'n,* 955 F.2d 1312, *cert. denied,* —— U.S. ——, ——, 112 S.Ct. 3056, 3057, 120 L.Ed.2d 922 (1992), a case in which the Ninth Circuit upheld a decision by the lower court to strike a statute ("Proposition 73") that had been adopted by popular initiative and limited the amount individuals and groups could contribute each fiscal year.[20] *See* 747 F.Supp. 580 (E.D.Cal.1990). Similar to plaintiffs in this case, plaintiffs in *Service Employees International Union v. Fair Political Practices* (labor organizations, elected officials, and individual campaign contributors) argued that Proposition 73 discriminated in favor of incumbents and against challengers because challengers do not typically decide to run for office years in advance of an election. As a result, challengers cannot engage in fundraising during the fiscal years between elections as incumbents commonly do.[21]

Citing *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the Ninth Circuit applied a heightened standard of judicial scrutiny and considered whether the contribution limits were necessary to achieve a substantial government interest. Recognizing that the government has a legitimate interest in preventing corruption and the appearance of corruption, the court nonetheless held (2–1) that the interest did not support a discriminatory formula for limiting contributions. 955 F.2d at 1321.[22] The court answered "the

---

**20.** Specifically, the contribution limitations provided that a person could contribute up to $1,000 to a candidate each fiscal year. Cal.Gov't Code § 85301(a). A "political committee" could contribute up to $2,500 to a candidate each fiscal year. *Id.* § 85303(a). A "broad based political committee" or political party could contribute up to $5,000 to a candidate each fiscal year. *Id.* § 85303(b). Finally, a person could contribute up to $2,500 per fiscal year to a political committee, broad based political committee, or political party for the purpose of contributing to a candidate. *Id.* § 85302.

**21.** The plaintiffs also challenged three other provisions of Proposition 73—a carry-over provision which prohibited the expenditure of campaign funds raised prior to January 1989, a ban on intra-candidate transfers of funds between controlled committees of a single candidate, and a

ban on inter-candidate transfers of funds between candidates.

The district court conducted a six day bench trial before concluding that Proposition 73's limitation on contributions on a fiscal year basis, ban on intra-candidate transfers, and ban on inter-candidate transfers were unconstitutional. The district court concluded that the carry-over provision was unconstitutional at the summary judgment stage.

**22.** Judge Wiggins, dissenting, found the majority's decision "egregious" and viewed the whole case as an effort by the Democratic Party and its major financial supporters to strike down a measure adopted by the people of California to curtail perceived abuses in campaign financing. 955 F.2d at 1327. Noting that none of the plaintiffs (unions, the Democratic Party, Democratic incumbents, and other plaintiffs with closely re-

crucial question, ... whether there [was] an appropriate governmental interest suitably furthered by the differential treatment" in the negative. 955 F.2d at 1321 (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972)).

*Service Employees International Union* is distinguishable from the instant case. Unlike the contribution limitations imposed by Initiative 41, which follow the federal model in limiting the amount of money contributors can give during *each election cycle*, the contribution limitations imposed by Proposition 73 limited the amount contributors could give during *each fiscal year*. The majority in *Service Employees International Union* placed great emphasis on this fact in reaching its decision. *See* 955 F.2d at 1321; *id.* at 1325–26 (Wiggins, J., dissenting).

The contribution limitations imposed by Initiative 41 are analogous to those imposed by the Federal Election Campaign Act and upheld in *Buckley*. Initiative 41's contribution limitations do not distinguish between candidates based upon party affiliations or ideological viewpoint; moreover, like the contribution limitations at issue in *Buckley*, one of the primary stated purposes behind Initiative 41's contribution limitations is to limit corruption and the appearance thereof.

As the Supreme Court suggested in *Buckley*, opponents in this case have produced data which suggests that Initiative 41 will tend to reduce, not benefit, the advantages of incumbency.[23] For example, opponents assert that the limitations will prevent incumbents from raising money in large increments in the future. Four non-incumbent candidates have moved to intervene in support of the constitutionality of this statute. Moreover, opponents point out that incumbent members of the City Council have worked consistently to repeal Initiative 41.

Opponents in this case recognize, as did the Supreme Court in *Buckley*, that in some cases contribution limitations may favor incumbents. *See Buckley*, 424 U.S. at 33 n. 38, 96 S.Ct. at 641 n. 38. In fact, four non-incumbent candidates are plaintiffs in this action. Nonetheless, opponents argue that there is little indication that the contribution limitations will consistently harm challengers relative to incumbents. Noting the many built-in advantages of incumbency (such as taxpayer-funded newsletters, television programs, and citizen-service initiatives), opponents maintain that Initiative 41's limitations will help mitigate, rather than exacerbate, inequalities between major and minor party candidates.

■ As in *Buckley*, the Court does not believe that the plaintiffs in the instant case have met their burden of showing that Initiative 41 invidiously discriminates against a particular and cognizable class, or that Initiative 41 was passed with discriminatory intent.[24] However, because the contribution limitations imposed by Initiative 41 pose an additional equal protection concern the Supreme Court has not yet considered, this Court's equal protection analysis cannot end here. The Court must also consider whether the "window" between the date the District of Columbia voters passed Initiative 41 (November 3, 1992) and the date the law became effective (March 17, 1993) makes Initiative 41 constitutionally infirm on equal protection grounds. During this interim period, some

---

lated interests) were themselves challengers, Judge Wiggins remarked the plaintiffs would be disadvantaged by Proposition 73 because it harmed incumbents and special interests, not the majority's challengers. *Id.* at 1323. Judge Wiggins found no constitutional violation because (1) the record showed no invidious discrimination and (2) Proposition 73 actually benefited the challengers as a class. *Id.* at 1327.

**23.** To support their argument that the lower contribution limitations will help minor party and independent candidates, opponents note that an analysis of the 1990 Mayoral race shows that, while close to one-half of the contributors to the

campaigns of major party candidates John Ray and Sharon Pratt Dixon gave over $100, 72% of the contributors to the campaign of minor-party candidate Maurice Turner gave $100 or less, 82.8% of the contributors to the campaign of independent Brian Moore gave $100 or less, and 100% of the contributors to the campaign of minor-party candidate Sam Manuel gave $100 or less.

**24.** Even applying a strict scrutiny test, as plaintiffs advocate, the Court refrains from enjoining Initiative 41 at this stage for the reasons indicated earlier in this Memorandum Opinion.

incumbents who planned to campaign in future elections compiled large "war chests" which consisted primarily of contributions exceeding the $50 and $100 limits imposed by Initiative 41.[25]

Opponents minimize this infirmity as a one-time, "start up" problem that is not a feature of the Initiative 41 itself. In addition, Intervenor District of Columbia maintains that a decision by this Court enjoining Initiative 41 will not necessarily remedy the "start up" problem because if the Court strikes Initiative 41, incumbents who wish to run for re-election in 1996 will take advantage of a "newly-created window" (between present day and election day) to raise funds for 1996, just as candidates running for re-election in 1994 took advantage of the November, 1992—March, 1993 window.

Plaintiffs contend that the realities of the political campaign process are such that this scenario would not occur. Similarly, while plaintiffs admit that no formal or informal barriers prohibited current challengers from also raising funds in excess of $50 and $100 during the "window" of opportunity, they assert that such tactics were unrealistic because at the time District of Columbia voters passed Initiative 41, the current elections were two years away, and the plaintiff candidates had not yet decided to run for office.

The United States District Court for the Eastern District of Louisiana rejected a similar equal protection challenge in *Mintz v. Barthelemy,* 722 F.Supp. 273, 280 (E.D.La. 1989), *aff'd,* 891 F.2d 520 (5th Cir.1989). In that case, a candidate argued that contributions received prior to the implementation of a contribution limitation violated his equal protection rights as a "latecomer." *Id.* at 281. Judge Patrick E. Carr rejected the plaintiff candidate's argument on the grounds

that he was not prohibited from raising money prior to the contribution cut-off, the contributions raised were not a product of incumbency, and there was no evidence that the legislature intended the law to favor incumbents in such a fashion. *Id.* at 280–81.

Although the Court is greatly troubled by the significant advantage Initiative 41's "window" of opportunity has afforded incumbents who had the foresight to exploit the timing loophole, plaintiffs have not convinced the Court that there is a substantial likelihood that they can succeed on the merits of their claim at this time. This Court agrees with Judge Patrick E. Carr's analysis in *Mintz* and believes the Supreme Court implicitly rejected plaintiffs' equal protection argument in *Buckley. See Mintz,* 722 F.Supp. at 282.

**3. Doctrine of Laches**

■ Opponents argue that plaintiffs' action is barred by laches because plaintiffs waited until after legislation to amend Initiative 41 was stalled in the Government Operations Committee of the Council before they decided to file this action.

The Court declines to rule that plaintiffs are barred by laches from asserting their constitutional claims. Plaintiffs filed this action soon after the contribution limits began to affect them. In this Circuit, the burden rests on the defendant to prove inexcusable delay and undue prejudice. *Daingerfield Island Protective Society v. Lujan,* 920 F.2d 32, 37 (D.C.Cir.1990). In the Court's view, opponents have failed to meet their burden.

**C. *IRREPARABLE INJURY TO PLAINTIFFS***

Plaintiffs have presented considerable evidence to support their claim that they will

25. Mayor Sharon Pratt Kelley raised $717,738.67 for her re-election campaign prior to the effective date of Initiative 41, of which 95.5% was raised in contributions greater than $100, and all but $120,352.27 of which would have been unlawful to give or receive had Initiative 41 been in effect. Other incumbents raised similar "war chests" composed primarily of contributions greater than would be permitted under Initiative 41. For example, incumbent At–Large Councilmember Linda Cropp, who is running for re-election in 1994, raised more than $97,000 before the new limits became effective, of which 96.6% was raised in contributions larger than $100, and all but $17,375 of which would have been unlawful to give or receive had Initiative 41 been in effect. Similarly, incumbent Ward Five Councilmember Harry L. Thomas, Sr., raised $35,755 for his 1994 re-election campaign prior to the effective date of Initiative 41, of which 99% was raised in contributions greater than $50, and all but $5,275 of which would have been unlawful had Initiative 41 been in effect.

suffer irreparable harm if defendants are not enjoined from enforcing the contribution limitations imposed by Initiative 41. The date of the primary election is September 13, 1994, just over six weeks away, and the 1994 election campaign is now well underway. Candidates for the 1994 elections have already begun raising and spending funds.

The Court does not accept plaintiffs' contention that the contribution limitations imposed by Initiative 41 harm challengers as a class. However, plaintiffs have convinced the Court that in certain instances, non-incumbent, minor and independent party candidates may be significantly harmed by the limits imposed by Initiative 41. Because Republican, Statehood, Libertarian and Independent Party candidates, for example, operate from a relatively small base of supporters in the District of Columbia, it may be necessary for these candidates to receive contributions in excess of $50 and $100 to achieve financial parity, or a "level playing field," in their campaigns against other incumbent, major-party and wealthy candidates.

### D. *HARM TO OTHER PARTIES*

■ Opponents claim that a number of third parties will suffer grave harm if the Court enjoins the Board of Elections from enforcing Initiative 41. These third parties include: candidates who have raised and spent funds for more than half of the election cycle, running successful "low cost" campaigns under the contribution limitations established under Initiative 41;[26] contributors who have limited their contributions in accordance with the limits imposed by Initiative 41; the Office of Campaign Finance which has altered its regulations and technology to enforce the new contribution limitations;[27] and District of Columbia voters who passed Initiative 41 by a 2–1 margin.

Plaintiffs assert that the only real harm will accrue to those incumbent office holders who have amassed "war chests" with contributions greater than $50 or $100 before Initiative 41 became effective. Furthermore, plaintiffs point out that enjoining the new limits imposed by Initiative 41 will not leave this area unregulated because Initiative 41 did not repeal the District's prior campaign contribution limit law.

Evaluating the evidence before the Court at this time, the Court concludes that harms that various third parties will incur if the Court enjoins the Board of Elections from enforcing Initiative 41 are substantial and weigh in favor of denying plaintiffs' application for a preliminary injunction.

### E. *PUBLIC INTEREST*

■ This case poses strong conflicting public interests. On the one hand, it is in the public's interest to protect the infringement of plaintiffs' constitutional rights. Balanced against this interest, however, is the public's interest in sustaining a law which was passed by an overwhelming margin by the voters of the District of Columbia "to limit campaign contributions so as to prevent improper influence over elected officials and to foster public confidence in the integrity of the government." *See* Initiative 41. Had plaintiffs demonstrated a substantial likelihood of success on the merits, the Court would hold that they have met the public interest criterion as well because there can be no public interest in enforcing an unconstitutional law, even one enacted by the voters. *See Citizens Against Rent Control v. Berkeley*, 454 U.S. at 295, 102 S.Ct. at 437 ("the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation."). However, given that plaintiffs have failed to establish at this juncture a strong likelihood of success on the merits, the Court concludes that the public

---

**26.** Opponents also point out that there are individuals who would have run for office if Initiative 41 had not been in effect. These individuals are now precluded from running for office this year because the deadlines for declaring candidacy have expired.

**27.** Since the passage of Initiative 41, the Office of Campaign Finance has educated its staff, re-

programmed its computers, and launched an aggressive educational campaign to inform filers, citizens and public officials of the new law's requirements. According to Joyce Dudley, the Office's Audit Manager, reversing the contribution limitations at this time would result in total chaos within the Office. *See* Def's Exh. 2.

interest is best served by denying a preliminary injunction and awaiting further development of the record.

## CONCLUSION

Although plaintiffs have demonstrated that they may be irreparably harmed if the contribution limitations imposed by Initiative 41 continue in effect, weighing the other equitable factors, as this Court must, the Court concludes that plaintiffs have failed to carry their burden of showing they are entitled to injunctive relief. Reviewing plaintiffs' constitutional claims on plaintiffs' application for a preliminary injunction, the Court is not convinced that plaintiffs' constitutional rights are being infringed by Initiative 41. The Court recognizes, however, that it may reach a different outcome when it review plaintiffs' constitutional claims on the merits, either at the summary judgment stage or at trial.

For the reasons stated in this Memorandum Opinion, the Court concludes that the balance of equities favors defendants. Accordingly, the Court denies plaintiffs' application for preliminary injunction.