**NATIONAL BLACK POLICE ASSOCIATION, et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, et al., Defendants.**

Civ. No. 94–1476 (TFH).

United States District Court, District of Columbia.

April 18, 1996.

Lawrence H. Mirel, Washington, D.C., Daniel J. Standish, Lisa Ann Burns, Erik J. Salovaara, Ross, Dixon & Masback, Washington, D.C., Arthur B. Spitzer, ACLU, Washington, D.C., for Plaintiffs.

Alice P. McCrory, Washington, D.C., William H. Lewis, Washington, D.C., for Defendants.

Dennis Michael Flannery, Roger Michael Witten, Margaret Lee Ackerley, Washington, D.C., Common Cause, Amicus.

### *MEMORANDUM OPINION*

THOMAS F. HOGAN, District Judge.

In this action, the plaintiffs challenge the constitutionality of a District of Columbia statute restricting campaign contributions to candidates for local office. Because the contribution limits improperly infringe upon candidates' and voters' First Amendment rights, the Court will enjoin enforcement of the statute.

---

**1.** The old limits, though superseded by Initiative 41, are set forth at D.C.Code § 1–1441 (1981). They allowed contributions of up to $2000 to candidates for Mayor, $1500 to candidates for District of Columbia Council Chair, $1000 to candidates for Council Member At–Large, $400 to candidates for Ward Council Member or Board of Education Member At–Large, and $200

## I.  BACKGROUND

### A.  Initiative 41

In 1992, District of Columbia voters approved the enactment of Initiative 41, now codified at D.C.Code § 1–1441.1(a) & (b) (Supp.1995). Initiative 41 prohibits contributors from giving more than $100 per election cycle to candidates for District-wide office or more than $50 per cycle to candidates for ward office or political party posts. The law also prohibits any contributor from giving more than $600 to all candidates in any election. These new limits replace substantially higher caps, which ranged from $200 to $2000 per contributor per candidate, depending upon the race.[1]

### B.  The Plaintiffs' Claims

The plaintiffs, who play a variety of roles in the District of Columbia's electoral process, challenge the constitutionality of Initiative 41 on several grounds. They argue that the new limits deprive them of their rights of freedom of speech and freedom of association by (1) preventing them from making or receiving contributions in excess of the limits; (2) limiting the amount of information they can receive about candidates; and (3) restricting the rights of political parties to decide what contribution limits should apply to intra-party races.

The plaintiffs also argue that they are deprived of their First Amendment freedoms without equal protection of the laws because the caps unfairly burden (1) challengers who did not have an opportunity to accept larger contributions before Initiative 41 took effect; (2) minority-party and independent candidates; (3) candidates without personal wealth; (4) candidates who must compete in contested races in both primary and general elections; and (5) challengers in general.[2]

Finally, the plaintiffs restate the above constitutional claims by alleging that the caps

---

to candidates for Ward Board of Education Member or political party seats.

**2.** The plaintiff's claim that Initiative 41 discriminates against challengers in general is not mentioned in the parties' joint pretrial statement, but the plaintiffs include the argument in their proposed findings of fact and conclusions of law.

violate the District of Columbia Self–Government and Governmental Reorganization Act of 1973 (the "Home Rule Charter"). That provision, set forth at D.C.Code § 1–204 (1981), provides that all District of Columbia statutes must be consistent with the United States Constitution.

### C. The Parties

There are five individual and four organizational plaintiffs. John Harvey, Ron Magnus, and Vincent Orange are suing as both contributors and candidates for public office. In 1994, Harvey ran for Council Member At–Large and Magnus ran for Ward 5 Council Member. Orange ran for Council Chair in 1990 and 1993 and for Ward 5 Council Member in 1994. Ronald E. Hampton is suing as a contributor and as the Executive Director of the National Black Police Association. Katherine S. Broderick is suing as a contributor and voter. The Libertarian Party and the District of Columbia Chapter of the Republican National African American Council ("DC–RNAC") are both suing as political organizations interested in controlling the terms of party primary elections without the interference of governmentally imposed contribution caps. These two organizations, along with the National Black Police Association and the American Civil Liberties Union of the National Capital Area, are also suing on behalf of their members who vote, run for office, and contribute to political campaigns in the District of Columbia.

The defendants are the District of Columbia and the District's Board of Elections and Ethics. The latter is responsible for the implementation and enforcement of Initiative 41.

Three other organizations had moved to intervene as defendants, but the Court denied their motions and allowed them to participate as *amici*. These are Common Cause, Common Cause/District of Columbia, and the Association of Community Organizations for Reform Now, Inc. ("ACORN").

### D. Procedural History

After denying the plaintiffs' motion for a temporary restraining order, the Court heard argument on the plaintiffs' motion for preliminary injunctive relief on July 21, 1994. The resulting opinion denying the motion is published at *National Black Police Association v. District of Columbia Board of Elections and Ethics*, 858 F.Supp. 251 (D.D.C. 1994).

In that opinion, the Court made an initial assessment of the merits of the plaintiffs' claims and balanced them against the other injunctive factors set forth in *WMATC v. Holiday Tours*, 559 F.2d 841, 844 (D.C.Cir. 1977). The Court did not dispose entirely of any of the plaintiffs' claims, but did find that the likelihood of success was not clear enough to warrant preliminary injunctive relief. For example, the Court noted that the caps imposed by Initiative 41 seemed quite restrictive, but decided that it could not determine with certainty whether the caps were so low that they stifled candidates' ability to spend money on their campaigns. 858 F.Supp. at 258. Similarly, the Court stated that it did not have enough information to weigh the governmental interest in limiting contributions or to assess the appropriateness of the caps in serving that interest. *Id.* at 259. The Court also declined to assess the plaintiff's claims regarding voters' right to receive information and political parties' right to set their own contribution caps for party primaries. *Id.* Finally, the Court rejected the plaintiff's Equal Protection Arguments, at least "at th[at] stage," because the plaintiffs had shown no invidious discrimination or discriminatory intent. *Id.* at 261–62 and n. 24.

In February 1996, the Court heard evidence in a bench trial lasting five days. The parties and *amici* then submitted further briefs and returned for final argument. The following opinion is based upon the Court's consideration of the evidence presented at trial and the various arguments advanced by the parties and *amici* in their papers and in court.

### II. FIRST AMENDMENT CLAIMS: FREEDOM OF SPEECH

### A. Legal Standard

The Court must evaluate the plaintiffs' First Amendment claims in light of *Buckley*

*v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In that case, the Supreme Court considered the constitutionality of various provisions of the Federal Election Campaign Act of 1971 ("FECA"), including a cap on campaign contributions.

The *Buckley* Court decided that contribution caps can burden First Amendment rights, but pointed out that such limits are not as constitutionally suspect as expenditure caps. It explained that the latter

> necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

*Id.* at 18–19. However, by contrast, the Court noted that contribution limits

> entail[ ] only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution.... A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication.

*Id.* at 20–21. *See also id.* at 23 (concluding that FECA's "expenditure ceilings pose significantly more severe restrictions on protected freedoms of political expression and association than do its limitations on financial contributions.")

It appears that the *Buckley* Court concluded no further examination was necessary if a contribution cap involved only the abovementioned "little direct restraint" on First Amendment rights. However, the Court went on to note that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Id.* at 21. It is unclear what analysis is appropriate if this "severe impact" exists; in *Buckley,* the Court found that there was no such impact and did not scrutinize FECA's contribution caps further. It conducted no balancing of the governmental interests in imposing such caps against the appropriate breadth of the caps. *Id.*

The parties disagree as to whether the Court should apply "strict scrutiny" or some more relaxed test. This dispute has arisen in other cases as well. *See, e.g., Carver v. Nixon,* 72 F.3d 633, 636–37 (8th Cir.1995). The conflict arises from the broad range of language used in *Buckley.* In some places, the Court suggests that all First Amendment activity should be afforded maximum protection, *see, e.g.,* 424 U.S. at 14, 96 S.Ct. at 632 (First Amendment "affords the broadest protection to political expression"); *id.* at 14–15, 96 S.Ct. at 632–33 (First Amendment "has its fullest and most urgent application" to political campaigns). However, these excerpts stand in contrast to the Court's view, discussed above, that contribution caps are a relatively minor threat to First Amendment rights.

■ In the end, none of these passages from *Buckley* resolves the question of exactly how to examine contribution caps once they have been determined to have a severe impact upon free speech rights. For purposes of this case, however, the Court must take the next analytical step and choose the appropriate standard. The best option is the balancing test set forth in *Buckley*'s discussion of freedom of association. There, the Court held that a "significant interference" with association rights could be sustained only if the defendants "demonstrated a sufficiently important interest and employed means closely drawn to avoid unnecessary abridgment of constitutional freedoms." *Id.* at 25, 96 S.Ct. at 638. Because the freedoms of speech and association are closely intertwined in the political setting, it is appropriate to use this test in a freedom of speech analysis. *See also Carver v. Nixon,* 72 F.3d at 636–38 (reaching same conclusion to apply test articulated in *Buckley,* but without ana-

lytic distinction between freedom of association and freedom of speech).

## B. Discussion

*1. Severe Impact.* The caps established by Initiative 41 do have a severe impact on political dialogue because they prevent candidates from amassing the resources necessary for effective advocacy. The exhibits presented by both parties support this conclusion and highlight three principal facts. First, a large percentage of contributors used to give amounts in excess of the limits now imposed by Initiative 41. Second, candidates' total fundraising receipts have declined since the enactment of Initiative 41. Third, and most critically, the lower amounts now raised are insufficient to promulgate candidates' political messages, particularly since some campaign resources are now redirected toward fundraising. These points are discussed in turn.

First, it is clear that Initiative 41 has changed the pattern of contribution activity in the District of Columbia. Before the caps were in place, many contributors gave more than $50 or $100 to a candidate. Though the record does not contain a complete listing of all contributions made to all candidates in the 1990 election cycle, there is sufficient evidence to show that contributions in excess of Initiative 41's limits were fairly common.

Of the nine strongest contenders for Mayor in 1990,[3] the record contains contribution listings for seven of those candidates.[4] Those listings show that all seven received a large percentage of contributions in excess of the $100 cap later set by Initiative 41:

| Candidate | Contributions Over $100 | Total Contributions | Percentage of Contributions Over $100 |
|---|---|---|---|
| David Clarke | 870 | 2141 | 41% [5] |
| Sharon Pratt Dixon | 3231 | 5984 | 54% [6] |
| Walter Fauntroy | 452 | 959 | 47% [7] |
| Charlene Drew Jarvis | 626 | 1800 | 35% [8] |
| Brian Moore | 5 | 29 | 17% [9] |

3. This selection is based on a rough estimate of the candidates' viability measured by the total funds raised by each candidate. There were thirty-two declared candidates for Mayor in 1990. Seventeen did not raise any funds at all and another six raised less than $2000. For purposes of analyzing the contribution caps, it is reasonable to eliminate these candidates. Though the remaining candidates were not all funded at similar levels, they represent a useful cross-section of political contenders.

4. The parties did not introduce the campaign contribution files of Marion Barry or Nancy Lord. Though their files would have augmented the record, there is enough data about the 1990 mayoral race to validate the Court's conclusions without them.

5. Defendants' Exhibit 19 (contribution data for Clarke). The Court arrived at these figures by counting the number of contributions in excess of $100 and dividing that sum by the total number of contributions to Clarke. The total includes two recorded contributions for which no amount was listed. These contributions were assumed to be under $100.
In fact, the percentage of contributions in excess of the cap is probably even higher than the figure listed in the table, since the Court was unable to take note of instances in which a single contributor gave money on more than one occasion. Though each contribution may have been less than $100, once the aggregate for a single contributor exceeded $100, all other contributions should have been included in the excess total.

6. Defendants' Exhibit 11 (declaration of Christopher Gomez summarizing contribution data for Dixon). The declaration set forth the number of contributions below the cap, but the Court found the difference between that figure and the total number of contributions in order to determine the number of above-cap contributions.

7. Defendants' Exhibit 21 (contribution data for Fauntroy). The Court arrived at these figures in the manner described in footnote 5, *supra.*

8. Defendants' Exhibit 20 (contribution data for Jarvis). The Court arrived at these figures in the manner described in footnote 5, *supra.*

9. Defendants' Exhibit 9 (declaration of Craig Wu summarizing contribution data for Moore). The declaration set forth the number of contributions below the cap. *See* footnote 6, *supra.*

| Candidate | Contributions Over $100 | Total Contributions | Percentage of Contributions Over $100 |
|---|---|---|---|
| John Ray | 1451 | 3274 | 44% [10] |
| Maurice Turner | 696 | 2486 | 28% [11] |

This information is only a rough indicator of the impact of Initiative 41. Because it counts contributions, and not dollars, it does not show what percentage of each candidate's funds was raised in excess of the cap.[12] However, even this data reveals substantial above-cap contribution activity. Seven of the nine strongest mayoral candidates received from 17% to 54% of their contributions in amounts over $100.

Other races from 1990 show similar results. Of the 27 strongest candidates [13] running for the six council seats open in 1990, the record includes contribution listings for eight of them. Though a larger data set would have provided a more accurate picture of the pre-Initiative 41 fundraising pattern, these records are still numerous enough to outline contributors' giving patterns. Furthermore, the plaintiffs have calculated the above-cap percentages in terms of both dollars and contributions, as set forth below.[14]

| Candidate (Race) | Contributions Over Cap [15] | Total Contributions | % Over Cap | Receipts Over Cap | Total Receipts [16] | % Over Cap |
|---|---|---|---|---|---|---|
| Vincent Orange (Council Chair) | 14 | 122 | 12% | $ 4,735 | $ 29,420 | 16% |
| Linda Cropp (Council At–Large) | 231 | 721 | 32% | $82,104 | $128,536 | 64% |
| Hilda Mason (Council At–Large) | 99 | 397 | 25% | $25,375 | $135,116 | 19% |
| Frank Smith (Council Ward 1) | 303 | 360 | 84% | $62,055 | $ 95,569 | 65% |
| Jim Nathanson (Council Ward 3) | 262 | 1084 | 24% | $34,668 | $ 78,088 | 44% |
| Harry Thomas (Council Ward 5) | 238 | 433 | 55% | $35,940 | $ 48,371 | 74% |
| Robert Artisst (Council Ward 5) [17] | 20 | 24 | 83% | $ 1,113 | $ 2,313 | 48% |
| Harold Brazil (Council Ward 6) | 415 | 680 | 61% | $71,488 | $111,137 | 64% |

10. Defendants' Exhibit 9 (declaration of Craig Wu summarizing contribution data for Ray). The declaration set forth the number of contributions below the cap. See footnote 6, supra.

11. Defendants' Exhibit 9 (declaration of Craig Wu summarizing contribution data for Turner). The declaration set forth the number of contributions below the cap. See footnote 6, supra.

12. Money percentages can be extracted from the contribution listings submitted as the defendants' exhibits. However, the parties did not perform these calculations for the 1990 Mayoral race, and the Court declines to set foot down that arduous arithmetic path.

13. All candidates who had reported raising no money for their campaigns were eliminated from this group. See footnote 3, supra.

14. The plaintiffs' method of calculating these figures is considerably more precise than that used by the Court. Compare note 5, supra, with Plaintiffs' Exhibit 2 (declaration of Andrew Fox explaining methods used to extract summary data).

15. Races for Council Chair and Council Member At–Large are subject to $100 contribution caps, since they are District-wide races. All other Council races are ward-specific and subject to a $50 cap.

16. This total includes loans and contributions made by the candidates themselves, which are not subject to the limits of Initiative 41.

As these figures show, candidates received a substantial portion of their contributions in amounts higher than the caps that would later be imposed by Initiative 41. The plaintiffs' dollar-based calculations strengthen this conclusion, since in most cases those percentages are even higher than the percentage of contributions above the cap.

The numerical evidence is supported by the anecdotal testimony of the witnesses. Ron Magnus, John Harvey, and Vincent Orange all testified that they believed some 1994 contributors would have given them more money had it been legal to do so. Orange, Broderick, and Hampton also stated that they would have given more money to candidates if they could have. Perry Willis, Director of the Libertarian National Committee, testified that his party would have provided more support to at least one candidate had the caps not been in effect. Hampton also testified that other members of the National Black Police Association wanted to give more than the caps allowed. Similarly, Mary Jane DeFrank testified that members of the American Civil Liberties Union of the National Capital Area also would have given larger contributions.

Some of the defendants' witnesses testified that they had never given more than the amounts set by Initiative 41 and would not do so now, either because they could not afford it or because they were not interested in spending that much money on a political race. In particular, Terry Lynch testified that the amounts he collected in his own fundraising efforts as Executive Director of the Downtown Cluster of Congregations were usually quite small and well under the limits of Initiative 41. Though it is undoubtedly true that Initiative 41's limits will not alter the contribution patterns of some individuals, the data presented above shows that many other people are constrained by the caps.

The contribution data and testimonial evidence do not suffice to show that the caps are unconstitutional or even that they prevent candidates from amassing sufficient campaign resources. However, they do indicate the extent to which Initiative 41 has changed the fundraising scenario for District of Columbia races. This information is a useful backdrop for the other evidence.

The second salient point of the trial evidence is that candidates' total fundraising receipts declined after the enactment of Initiative 41. In 1990, forty-eight candidates for various Council seats raised approximately $1.8 million. Plaintiffs' Exhibit 179 at 4. In 1994, sixty-six candidates for the same number of seats raised approximately $1.35 million. *Id.* at 11.[18] This is a substantial drop, but the mayoral races provide an even more dramatic example. In 1990, thirty-two mayoral candidates raised approximately $5.6 million. *Id.* at 13. In 1994, thirty-six candidates raised approximately $2.2 million. *Id.* at 15.

Again, a mere drop in revenues does not equate to a constitutional violation. However, in this case the reduction was so substantial that it affected the candidates' ability to reach voters. This is the third essential message of the trial evidence. The testimony and exhibits showed that when candidates raised less money after the enactment of Initiative 41, they were unable to participate fully in many traditional forms of campaigning and had to resort to less effective methods of disseminating their respective messages. This effect was exacerbated by the fact that candidates were not able to spend as much time communicating with voters about substantive matters because they were forced to focus more heavily on fundraising. The testimony of John Ray and Jim Nathanson, who ran campaigns both before and after the effective date of Initiative 41, pro-

---

17. The Court calculated the summary data for this candidate, using the information provided in Plaintiffs' Exhibit 197. All other summary data shown in this table was calculated by the plaintiffs and is set forth at Plaintiffs' Exhibit 2.

18. The plaintiffs point out that the 1994 total would be only $804,518.23 if the fundraising receipts of John A. Wilson are excluded. Wilson died before the election cycle was completed.

vides two vivid illustrations of the Initiative's impact.[19]

Ray has been a member of the District of Columbia Council for seventeen years. He ran for mayor of the District of Columbia in 1990 and 1994. In 1990, he raised approximately $1.4 million for his mayoral campaign, and in 1994, he raised approximately $388,000. Plaintiffs' Exhibit 179. Virtually every prong of his 1994 campaign was hampered by the lack of funds.

Television advertising was an important component of Ray's District-wide 1990 campaign. Television helped him develop his campaign themes, convey his message, and attain name recognition among voters. He also was able to produce and distribute a biographical video. Plaintiffs' Exhibit 121. Ray wanted to use television advertising in his 1994 campaign but was unable to afford it because of the limits imposed by Initiative 41.

Ray also used radio advertising during his 1990 campaign, which cost approximately $30,000. Plaintiffs' Exhibit 107 at JR000182. Although he used some radio advertising in 1994, he was able to spend only $800 on that medium because of the limits on his ability to raise funds caused by Initiative 41. The inability to use more radio was particularly devastating to his campaign in 1994 because a large percentage of the voters he needed to target received information by radio.

In 1990, Ray was able to develop an extensive mailing plan that highlighted his message and reached many voters. See Plaintiffs' Exhibit 85. He sent out several targeted mailings addressing issues of concern to the electorate, including crime, senior citizens' rights, and tenants' rights. See Plaintiffs' Exhibits 102, 103, and 104. He also developed and used a tabloid-style brochure that was mailed and distributed to voters. See Plaintiffs' Exhibit 95. He testified that a candidate who sends out repeated mailings has a better chance of conveying his or her message to voters than a candi-

date who sends only one mailing because the mailings can highlight different issues and make it more likely that a voter will hear a candidate's name and consider his or her views. Due to the financial constraints imposed by Initiative 41, however, Ray was able to send only one mailing during his 1994 campaign for mayor. Id.

Ray was also restricted in other areas. Though he spent approximately $35,000 on polling in 1990, see Plaintiffs' Exhibit 107 at JR000182, he was unable to afford to conduct any polls at all in 1994. He was also unable to produce and post as many yard signs in 1994 as he had used in 1990.

Ray's pattern of campaign activity changed after the enactment of Initiative 41. In 1994, he devoted 80 to 90 percent of his time to fund-raising, which was a significant increase from 1990. In 1994, in order to work with the new contribution limits, Ray decided that he would have to hold only fund-raising events. In 1990 he was able to hold events where contributions were not requested. Because many voters did not attend events if they felt they had to contribute to Ray's campaign, Ray reached fewer voters at campaign events in 1994.

Nathanson's story is similar to Ray's. Nathanson ran for Ward 3 Council member in 1986, 1990 and 1994. In 1986, he raised approximately $84,000. In 1990, he raised approximately $78,000. Plaintiffs' Exhibit 179 at 3. In 1994, after the enactment of Initiative 41, Nathanson raised just over $41,000, of which $10,000 was a personal loan.

In all of his campaigns, Nathanson purchased newspaper advertisements. In 1986, he was able to run fourteen advertisements, and in 1990, seventeen. See Plaintiffs' Exhibits 75, 77, 141 and 142. In 1994, Nathanson could only afford to purchase three advertisements. See Plaintiffs' Exhibits 78 and 143.

Nathanson used mailings in connection with his campaigns. In 1986, he sent six

---

19. Where no citation exists, the following information was drawn from the testimony of John Ray or Jim Nathanson.

bulk mailings in the primary election and two in the general election. In 1990, he sent two bulk mailings in the primary election and two in the general election. Although Nathanson wanted to send three bulk mailings in 1994, he was able to afford only one due to the limit on his ability to raise funds caused by Initiative 41. *See* Plaintiffs' Exhibits 79, 80 and 81 (contents of 1994 mailing). Though the mailings in the early years were targeted to particular voters, in 1994 Nathanson was unable to afford such targeting.

This limitation on mailings had a distinct effect on the substance of the literature delivered. Prior to Initiative 41, Nathanson did not address more than two or three issues in any single mailing. After Initiative 41, however, he was constrained to combine as many issues as possible into a single mailing and solicit funds at the same time, which was a less effective way of communicating his views to voters. Plaintiffs' Exhibits 79, 80 and 81.

Nathanson did use some campaign methods that cost little money, but they were not as effective as mailings or advertising. For example, he campaigned door-to-door in connection with each of his campaigns. He was able to go to roughly 30 percent of the freestanding homes in Ward 3. On average, he actually spoke to someone at 20 to 30 percent of those homes. Door-to-door campaigning is of limited effectiveness in a Ward 3 race because approximately 50% of Ward 3 residents live in apartment buildings that do not permit door-to-door solicitation. Nathanson also attended candidate forums in connection with each of his campaigns. However, Nathanson could not rely on candidate forums alone as a means of conveying his message to voters because the forums by and large were attended by the same small group of people.

In an attempt to show that the limits of Initiative 41 did not prevent candidates from running effective campaigns, the defendants presented testimony from two candidate witnesses who claimed to have successfully operated a campaign under the limits. However, both of these candidates enjoyed unusual circumstances that allowed them to campaign successfully when most candidates would not be able to do so.

Kathleen Patterson successfully ran for the Ward 3 Council seat in 1994, defeating, among others, Jim Nathanson. She spent approximately $36,000 on this effort. Patterson testified that she was able to campaign successfully under the limits by relying heavily on signage, door-to-door campaigning, hand distribution of literature to voters' homes, and in-home meetings with Ward 3 residents, and by conducting a few targeted mailings. She did not purchase any media advertising. Patterson believes that her campaign was able to reach the majority of Ward 3 single-family homes through its door-to-door campaign and literature drops.

There are several aspects of Patterson's campaign that make it atypical and thus not particularly helpful to the defendants' position. First, Patterson herself contributed approximately $13,000 to her own campaign.[20] By drawing over one-third of her total receipts from her own checkbook, Patterson was able to spend less time and energy fundraising than a candidate with fewer personal resources. Second, Patterson was acquainted with high-level experts in the public affairs field who were able to provide her with valuable advice not so readily available to her competitors. Third, Patterson and some of her friends spent $8000 or $9000 on polling before she declared her candidacy. This money is exempt from the limitations of Initiative 41. Though none of these items is singly dispositive, they show that Patterson's case is not typical: she had resources at her disposal to mitigate the effects of Initiative 41.

Another of the defendants' candidate witnesses was John Capozzi, Jr. Capozzi was elected to the District's United States Shadow Representative seat in 1994. He testified

---

**20.** According to Patterson's testimony, these contributions included approximately $8000 in contributions and a $5000 loan.

that he was not hampered by the limits of Initiative 41 because he had previously campaigned under a self-imposed contribution limit of $100 in earlier elections. Capozzi had developed a "grass-roots" method of meeting voters. He attended community meetings several nights a week and tried to reach registered voters within his party.

Capozzi is also an atypical example, for two reasons. First, he testified that he contributed approximately $6900 of his own money to his 1994 campaign. Though the record does not reflect Capozzi's total 1994 receipts, this self-contribution is substantial. Like Patterson, Capozzi is not a useful model for many candidates who seek to amass resources under the limits of Initiative 41. The Court will not assume that candidates can or must self-invest to the extent that Patterson and Capozzi did. Furthermore, Capozzi ran unopposed in the 1994 Democratic primary for the shadow seat. Therefore, his ability to run an effective campaign was not fully tested. Because the District of Columbia electorate is overwhelmingly Democratic, candidates who run unopposed in Democratic primaries face little practical challenge.

Other witnesses provided testimony supporting the conclusion that Initiative 41 makes it difficult for candidates to get their message to voters. For example, Ron Magnus testified that inexpensive methods of campaigning, including traveling door-to-door and attending candidate forums, were not effective ways of contacting large numbers of voters. Magnus also testified that the caps limited his 1994 Ward 5 campaign budget so much that he could not use radio and newspaper advertising, could not have a phone bank active for a long period of time, and could not conduct three ward-wide mailings. Because he was unable to carry out these plans, Magnus believed he reached only about 4000 of the approximately 41,000 Democratic voters in Ward 5.

The testimony of John Harvey also suggests that Initiative 41 prohibits candidates from disseminating their message. Harvey ran for an At–Large Council Seat in 1994, and found door-to-door campaigning and attending candidate forums relatively unhelpful to his campaign. Because Harvey was running in the Statehood party primary, he had to reach a relatively small number of voters diffused throughout the city. Harvey believes that if the caps had not been in place, he could have amassed some early "seed money" that would have enabled him to conduct targeted mailings and other forms of campaigning which would both get his message out and help him raise more funds.

Not surprisingly, the parties' experts are in disagreement over the effects of Initiative 41 on candidates' ability to express their political views. In particular, Edward Brookover [21] and Robert Stern [22] have differing opinions as to how much money candidates should spend on various forms of media advertising. Brookover testified that candidates should devote a relatively large percentage of their campaign funds to media advertising, especially television and radio advertising, as long as the budgets could withstand the expenditures. Stern, by contrast, testified that many traditional campaign expenditures, particularly for media advertising, are unnecessary. For example, Stern stated that television advertising for ward races was an "absolute luxury."

The Court will not resolve this difference of opinion between Brookover and Stern. It can evaluate the overall adequacy of post-Initiative 41 campaign budgets without deciding that certain campaign elements are crucial in given races. However, the Court does agree with some other statements made by the plaintiffs' expert witnesses, in part because they are supported by the testimony of various fact witnesses.

For example, Brookover testified that Initiative 41 skews candidates' time toward fundraising and away from other campaign activities which may be more substantive. This opinion is corroborated by the testimony of John Ray, among others. Brookover also testified that a candidate who relies heavily upon mailings must send three or four suc-

---

**21.** Brookover, an expert witness for the plaintiffs, is the Political Director of the National Republican Congressional Committee.

**22.** Stern, an expert witness for the defendants, is the Co–Director for the Center for Governmental Studies.

cessive mailings in order to capture voters' attention and focus on a few different issues of interest to voters. This opinion is consonant with the testimony of several of the plaintiffs' candidate witnesses, including Jim Nathanson.

On a similar note, Herbert Alexander [23] testified that he believed the caps were "far too little" to fund candidates' efforts to compete with other distractions facing voters. He explained that campaigns exhaust great resources because candidates must lure voters' attention away from work, recreation, and family interests in order to be able to disseminate a political message. Alexander's testimony resonates with that of the plaintiffs' witnesses: the candidates believed they needed to spend large sums on media advertising, mailings, and other expensive campaign elements in order to bring their message to the attention of voters. The Court suspects the candidates would agree with Will Rogers's conclusion that "politics has got so expensive that it takes lots of money to even get beat with."

■ In sum, based upon the facts and expert opinions outlined above, the Court finds that Initiative 41 severely limits candidates' right to speak freely in the political campaign arena. Because the caps substantially limit total fundraising receipts, candidates are prevented from spending the money necessary to conduct an effective campaign. This conclusion is fact-dependent, drawn from all of the record evidence and an evaluation of the witnesses' credibility. Similar caps in another jurisdiction may not have the same severe impact upon First Amendment rights that Initiative 41 does, because the District of Columbia is *sui generis*.

2. *Balancing Test.* Having reached the above conclusion, the Court must now determine whether the defendants have demonstrated a sufficiently important interest in enacting Initiative 41 and whether, in establishing the caps, the defendants have employed means closely drawn to avoid unnecessary abridgment of the candidates' free speech rights. On both prongs of this test, the defendants' case fails.

■ The defendants state that their motivating interest in imposing the caps was to prevent corruption and the appearance of corruption stemming from large campaign contributions. This is a valid governmental interest. *Buckley,* 424 U.S. at 25–27, 96 S.Ct. at 637–639. However, the "large" contributions in question in *Buckley* were more substantial than those here. Since the FECA limited contributions to $1000 per federal candidate, the Court only considered contributions larger than that amount in evaluating the validity of the government's interest. *See* 424 U.S. at 28, 96 S.Ct. at 639 (noting that $1000 cap focused upon "the narrow aspect" of contribution activity linked with actual or potential corruption).

Here, the defendants argue that the old contribution limits were not adequate to prevent corruption or the appearance of corruption. However, the old limits ranged from $200 to $2000, depending upon the race. D.C.Code § 1–1441 (1981). The defendants did not present convincing evidence that contributions under the old caps were large enough to raise a concern about corruption or the appearance of corruption. *See also Carver v. Nixon,* 72 F.3d at 643 (holding that previous contribution cap levels did not suggest possibility of corruption).

The defendants did present some general testimonial evidence related to the governmental interest in preventing corruption or the appearance of corruption, but the evidence was vague or inapposite. For example, voter and community activist Dorothy Brazille testified that she believed large contributions besmirched the integrity of some District of Columbia public officials. However, Brazille's primary example supporting her conclusion involved a $100,000 contribution to defray the expenses of a mayoral inauguration. Such gifts are not considered campaign contributions and are in no way affected by Initiative 41. Similarly, Donald Martin, who is president of amicus D.C. ACORN and was involved in the passage of Initiative 41, testified that supporters of the

---

**23.** Alexander, an expert witness for the plaintiffs, is the Director of the Citizens' Research Foundation and a professor of political science at the University of Southern California.

low caps were concerned about the influence that real estate developers' contributions would or could have upon elected officials' decision making. However, Martin testified that he formed his beliefs after reading a private report that, while discussing real estate developers' political influence, made no mention of campaign contributions. Without more, the testimony of Brazille and Martin does not show that the defendants had a sufficiently important interest in limiting contributions of the size allowed by District of Columbia law before the enactment of Initiative 41.

Furthermore, there is no evidence that the caps were closely drawn to prevent unnecessary abridgment of free speech rights. The defendants offered only scant evidence regarding the basis for the dollar amounts of the limits ultimately imposed by Initiative 41. In particular, Donald Martin testified that the limits were set where they were because the drafters of Initiative 41 believed that the vast majority of people could not contribute more than $50 or $100 to political campaigns. The defendants offered no other proof regarding the manner in which the limits were chosen. There was no evidence that, in setting Initiative 41's limits, anyone ever considered the costs associated with running campaigns for office in the District of Columbia; the impact of the limits on candidates' speech; or any other constitutional ramifications of the caps. In short, there simply was no evidence that Initiative 41 was tailored, narrowly or otherwise, in a manner to preserve the candidates' right to freedom of speech.

## C. Conclusion

Because Initiative 41 severely limits political dialogue, and because it does so without advancing a sufficiently important government interest by closely drawn means, it impermissibly burdens candidates' First Amendment right to freedom of speech. Having found a constitutional violation, the Court need not reach the question of whether the limits also impermissibly burden contributors' and voters' right to freedom of speech by some indirect mechanism traceable to the candidates' diminished political voice. The

plaintiffs did not expound upon this theory at any length and it would therefore be imprudent for the Court to address the issue.

## III. FIRST AMENDMENT CLAIMS: FREEDOM OF ASSOCIATION

### A. Legal Standard

■ The test for examining the impact of contribution caps upon the First Amendment right to freedom of association is considerably simpler than the two-step test for freedom of speech applied above. The *Buckley* Court noted that because contribution caps "limit one important means of associating with a candidate, . . . . the primary First Amendment problem raised by . . . contribution limitations is their restriction of . . . the contributor's freedom of political association." 424 U.S. at 22, 24–25, 96 S.Ct. at 636, 637–638. The Court then held that

> [e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.

*Id.* at 25, 96 S.Ct. at 638 (citation omitted). This is the same test adopted by this Court for the second stage of the freedom of speech analysis.

### B. Discussion and Conclusion

■ For the reasons stated above, the defendants failed to satisfy either prong of the *Buckley* balancing test. The defendants' purported interest in limiting corruption and the appearance of corruption is without solid basis in the evidence, at least as the interest relates to the former campaign contribution limits. Similarly, Initiative 41 does not appear "closely drawn" to address any legitimate interest that does exist. Therefore, the limits impermissibly burden contributors' First Amendment right to freedom of association.

The Court will not reach certain other freedom of association questions raised by the plaintiffs but not fully argued by the parties. These include (1) whether candidates' rights to freedom of association are violated because they cannot accept certain contributions; (2) whether voters' rights to

freedom of association are violated because they do not receive as much information about candidates now that Initiative 41 is in place; and (3) whether political parties' rights to freedom of association are violated because they cannot set their own contribution limits in primary parties.

## IV. EQUAL PROTECTION CLAIMS

### A. Legal Standard

The plaintiffs also make several equal protection arguments, alleging that Initiative 41 discriminates against various classes of candidates. The Court must analyze these claims in light of the equal protection analysis set forth in *Buckley*. There, the Court held that "[a]bsent record evidence of invidious discrimination against ... a class [of candidates], a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions." 424 U.S. at 31, 96 S.Ct. at 641.

### B. Discussion

The plaintiffs allege that Initiative 41 unfairly deprived five classes of candidates of their right to equal protection of the laws with respect to their First Amendment claims. Each set of claims will be discussed in turn.

■ First, the plaintiffs maintain that late-entering challengers in 1994 political races were unconstitutionally burdened because they had to run against incumbents who had the opportunity to begin raising funds before Initiative 41 took effect. With respect to this claim, the Court will adhere to the preliminary legal conclusions reached in its July 20, 1994 opinion. There, the Court observed that there was no legal bar preventing any challenger from raising money in excess of the caps before Initiative 41 took effect. Each candidate's personal decision as to when to enter the race determined whether he or she would be able to take advantage of the pre-Initiative 41 window. Any differential between candidates is therefore directly attributable to their own acts, and not to the operation of Initiative 41. *See Mintz v. Barthelemy*, 722 F.Supp. 273, 280 (E.D.La.1989), *aff'd*, 891 F.2d 520 (5th Cir.1989) (finding no constitutional violation attributable to similar pre-cap "window").

■ Second, the plaintiffs argue that Initiative 41 unfairly discriminates against minority-party and independent candidates. They explain that these candidates have a smaller base of support and therefore need to be able to raise more money from each potential contributor in order to compete against majority-party candidates. In *Buckley*, the Court was troubled by this argument, but found that the record in that case evidenced no invidious disadvantage to minority-party and independent candidates because the FECA's contribution caps were facially neutral. The Court also pointed out that caps "would appear to benefit minority-party and independent candidates relative to their major-party opponents because major-party candidates receive far more money in large contributions." 424 U.S. at 33, 96 S.Ct. at 641.

For the same reasons, the Court will reject the plaintiffs' argument here. Though minority-party and independent candidates would undoubtedly appreciate an exemption from the contribution caps in order to raise enough money to mount a David-and-Goliath campaign, there is no reason why the Court should alter a neutral statute in their favor. There are theoretical arguments in favor of both sides of this argument, and the record here, like in *Buckley*, does not resolve this disagreement by proving an invidious disadvantage to minority-party and independent candidates. There was a small amount of evidence suggesting that minority-party candidates could be uniquely harmed by the caps. For instance, witnesses testified that the Libertarian Party was unable to contribute its national mailing list to mayoral candidate Nancy Lord because the list had a value in excess of the caps. The plaintiffs argue that this restriction kept Lord from raising the "seed money" necessary to invigorate her campaign. This evidence, without more, is not sufficient to make out an Equal Protection claim, particularly in light of *Buckley*'s deference to neutrally-worded statutes.

■ Third, the plaintiffs claim that candidates without personal wealth are unfairly

disadvantaged by the caps because candidates with their own financial resources can supply large portions of their campaign funds without running afoul of the contribution limits. Though Initiative 41 clearly does distinguish between wealthy and non-wealthy candidates in this way, the distinction is constitutionally protected. In *Buckley*, the Court held that limits on self-contributions were unconstitutional because they restricted wealthy candidates' First Amendment rights without a legitimate purpose. 424 U.S. at 54–58, 96 S.Ct. at 651–653. The plaintiffs therefore cannot base an equal protection argument on the differential effect of Initiative 41 on wealthy and non-wealthy candidates.

■■■ The plaintiffs also argue that Initiative 41 unduly burdens candidates who must run in contested primary elections and then face opponents who advanced unopposed in their party primaries. The theory appears to be that candidates facing two contested elections must do more with a constrained budget than their opponents who run in uncontested primaries. Because the plaintiffs did not highlight this argument in their presentation of evidence and did not address this claim in their legal argument, the Court will not rule in their favor on this issue.

■■■ Finally, the plaintiffs argue that Initiative 41 unfairly discriminates against challengers as a class. The *Buckley* Court noted that contribution caps do not clearly favor incumbents, and this Court agrees. "To the extent that incumbents are generally more likely than challengers to attract very large contributions, [caps have] the practical effect of benefiting challengers as a class." 424 U.S. at 32, 96 S.Ct. at 641. The evidence at trial did suggest that some elements of the District of Columbia's political system may disadvantage challengers. For example, incumbents enjoy the benefits of constituent services funds, which are not subject to Initiative 41's contribution caps but can be used to garner favor with voters. However, the legitimacy of constituent services funds and other benefits of incumbency not associated with Initiative 41 are not challenged here. The Court cannot make adjustments to otherwise neutral contribution caps in order to correct other alleged maladies in the electoral system. Focusing upon the contribution caps themselves, the Court concludes that they do not burden challengers as a class.

## C. Conclusion

Because each of the plaintiffs' equal protection claims is without merit, the claims for injunctive relief on these grounds are denied. However, the plaintiffs have attained the same relief sought here by successfully pressing their First Amendment claims, discussed above.

## V. OTHER PROVISIONS OF INITIATIVE 41

Three substantial portions of Initiative 41 were not addressed in the parties' evidence or arguments. The first is the applicability of the cap to Board of Education races. Though Initiative 41 does impose new, lower contribution limits for those races, the testimonial evidence and exhibits did not address them in any way. The second area not covered concerns campaigns for the recall of public officials. Initiative 41 limits contributions to these campaigns, but the Court heard no evidence on recall efforts. Finally, the trial evidence and parties' arguments did not address the constitutionality of the aggregate contribution cap set forth at D.C.Code § 1–1441.1(b), which limits contributors to a total of $600 per election, regardless of the number of recipient candidates.

■■■ Even though the Court did not have an opportunity to review the constitutionality of these portions of Initiative 41, it will enter an order enjoining their enforcement. When only certain parts of a statute are declared unconstitutional, the other parts remain in force unless it is clear that the remaining provisions would not have been enacted alone. *Buckley*, 424 U.S. at 108–09, 96 S.Ct. at 677–78 (citing *Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)). Here, because all of the contribution caps appear to be part of a unified scheme to limit campaign giving in District of Columbia races, the Court will not disrupt that equilibrium by distinguishing between races for various public offices or by distinguishing be-

tween elections and recalls. Similarly, the Court will not preserve the validity of the aggregate contribution cap. To do so would have the unintended consequence of changing the maximum contribution to $600 per candidate for some races.

## VI. OTHER ASPECTS OF DISTRICT OF COLUMBIA ELECTION LAW

There are many aspects of District of Columbia election law not addressed by Initiative 41. Several of these may justify the fears of the defendants that corruption, the appearance of corruption, and an unfair advantage to incumbents exist, because they provide ways for incumbents to benefit from fundraising not restricted by Initiative 41. For example, incumbents' access to "constituent service funds"—raised and expended outside of campaign limits—may enhance their chances at the polls and give them an opportunity to alleviate the restrictions of Initiative 41. Furthermore, incumbents' ability to raise funds for their inaugural events gives them another means of accepting money from constituents and others. Also, the apparent failure in some cases of the restrictions on "independent expenditures" to insulate third-party campaign spending from the candidates' own efforts suggests another way in which the caps may be ineffectual.

The Court does not consider these elements in making its ruling. Though Initiative 41 operates in the context of these practices, the Court cannot reach out to address matters not brought before it by the parties. Whatever harms are wreaked by other aspects of District of Columbia campaign law must be cured by some other means. Because the Court's authority is limited to a review of Initiative 41, it must examine that measure alone.

## VII. ELECTORAL SUPPORT FOR INITIATIVE 41

In ruling that Initiative 41 is unconstitutional, the Court rejects a measure conceived and supported by the voters of the District of Columbia. This action brings to mind the fears of Thomas Jefferson, who once wrote that

the great object of my fear is the federal judiciary. That body, like gravity, ever acting, with noiseless foot, and unalarming advance, gaining ground step by step, and holding what it gains, is ingulfing insidiously the special governments into the jaws of that which feeds them.

15 *The Writings of Thomas Jefferson* 326 (Andrew A. Lipscomb ed., 1903), *quoted in Respectfully Quoted* 181 (Suzy Platt ed., 1989).

It is with considerable pause and deliberation that the Court makes this ruling. However, "the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 295, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981). Here, even when judged by the standard applied to legislative enactments, Initiative 41 is not constitutional. It is true that courts must "accord substantial deference to the predictive judgments" of a legislative body, but only when the body "has drawn reasonable inferences based upon substantial evidence." *Turner Broadcasting System v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2471, 129 L.Ed.2d 497 (1994). As discussed above, the Court cannot conclude that the drafters of Initiative 41 had any solid evidence upon which to make inferences about the need for and potential effects of Initiative 41. The rationale and deliberations of the drafters are barely evident in the record. Hence, the deference mentioned in *Turner Broadcasting System* is inappropriate here. *Carver v. Nixon,* 72 F.3d at 644.

## VIII. CONCLUSION

Though Initiative 41 does not violate the plaintiffs' right to equal protection under the law, it does impermissibly infringe upon the free speech rights of candidates and the free association rights of contributors. Therefore, the Court will enjoin enforcement of Initiative 41. An order will accompany this opinion.

## *ORDER*

In accordance with the Memorandum Opinion issued today, it is hereby ORDERED that the defendants are enjoined from enforcing D.C.Code § 1–1441.1(a) & (b) (Supp.1995) because the statute impermissibly infringes upon the free speech rights of candidates and the free association rights of contributors.